IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO: 10-CV-00005

| | |
|---|---|
| TRIAD PACKAGING, INC. and LOUIS WETMORE, | **PLAINTIFFS TRIAD PACKAGING, INC. AND LOUIS WETMORE'S MEMORANDUM OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| SUPPLYONE, INC., | |
| Defendant | |
| v. | |
| DURHAM BOX COMPANY, | |
| Third Party Defendant. | |

**NOW COMES** the Plaintiffs Triad Packaging, Inc. ("Triad") and Louis Wetmore

("Wetmore") (hereinafter together, "Plaintiffs") opposing Defendant SupplyOne, Inc's

(hereinafter, "SupplyOne") Motion For Summary Judgment On Plaintiff's Fraud And Unfair

And Deceptive Trade Practice Claims (Third and Forth Claims For Relief) and submitting this

Memorandum Opposing Defendant's Motion For Summary Judgment as to Plaintiffs' claims for

fraud and unfair trade practices.

## I. SUMMARY OF CLAIMS

SupplyOne, Plaintiff Triad and Third Party Defendant Durham Box Company d/b/a Merit

(hereinafter, "Merit") were all three businesses in the corrugated packaging business.

SupplyOne's business strategy includes buying the assets (not stock) of other packaging

companies that have established regional business. SupplyOne employs a sophisticated

1

acquisition strategy that uses fraudulent representations and omissions to cause the selling business to become dependent on SupplyOne's offer and so desperate that SupplyOne negotiates a completely new deal. SupplyOne used this pattern and practice to lure Wetmore to sell Triad's assets by promising attractive terms, including payment and closing certainty, when SupplyOne did not intend perform either. SupplyOne insisted on an exclusivity period that created detrimental reliance by Triad. Once Triad was desperate, SupplyOne refused to perform and forced a completely new deal for less money and new onerous terms. Then, after closing, once SupplyOne gained exclusive control over the business assets and financial information, SupplyOne intentionally breached the terms of the final contract intending to cause, and causing, further unjustifiable and unreasonable concessions from the seller. Once SupplyOne has control over the business assets and financial information, SupplyOne had a position of power and leverage that made it impossible for Triad to force SupplyOne to perform the contracts short of recovery through the courts.

SupplyOne's practices utilized fraud and detrimental reliance to acquire Triad and Merit from Wetmore. SupplyOne methodically applied their acquisition strategy to Wetmore's detriment. Plaintiffs rejected other good faith offers for more money based on SupplyOne's fraudulent promises. SupplyOne reduced the purchase price by more than five hundred thousand dollars. Then Plaintiffs were further damaged by fraudulent breaches of contract after SupplyOne took possession of Plaintiff's assets. Details of the intentional frauds by SupplyOne and SupplyOne's practices are set forth herein and subject to further discovery.

## II. **RELEVANT PROCEDURAL FACTS**

Plaintiffs Triad and Wetmore filed the Complaint in Catawba County, North Carolina on December 28, 2009. The Complaint and Summons were served on December 31, 2009.

2

Defendant removed the matter to the Federal Courts for the Western District on January 28, 2010. Defendant answered the Complaint and asserted Counterclaims and a Third Party Complaint against Third Party Defendant Durham Box Company (d/b/a Merit Container) (hereinafter, "Merit"). Merit responded to the Third Party Complaint, and filed Third Party Defendant Counterclaims for Breach of Contract, Fraud and Unfair Trade Practices against the Defendant.

Plaintiff Triad served its "First Request for Document Production" to Defendant on July 21, 2010. Defendant responded providing NO documents on August 20, 2010. Eventually on August 31, 2010, Defendant provided 820 pages of hard copy documents Bates Stamped SO000456 through SO001275. Defendant supplemented on December 1, 2010, with SO005262 through SO006763 and SOE007233 through SOE007761 ("Hard Copy Production"). On October 28, 2010, Defendant supplemented the initial Hard Copy Production with 7232 pages of electronic copies in PDF format Bates Stamp number SOE000001 through SOE007232 (hereinafter "First Electronic Production"). Defendant provided hard copies of supplemental materials marked SOE007233-007761 on December 1, 2010. Then Defendant provided additional supplemental electronic production of pages Bates stamped SOE007762 through SOE016977, on January 24, 2011 (received while Plaintiff's counsel was taking depositions in Pennsylvania). Defendant supplemented again the Hard Copy Production on February 2, 2011 with Bates 006764 through SO 006771. This Memorandum uses Defendants Bates stamp numbers identified above.

Plaintiff received Defendant's Motion for Summary Judgment *only as to* Plaintiff's Claims of Fraud and Unfair Trade Practices on Friday, December 10, 2010. On that same day, Plaintiff noticed a 30(b)(6) deposition of Defendant's Corporate Designee to occur on January 5,

3

2011. Plaintiff also noticed the deposition of Defendant's Senior Vice President Bill Laughlin on January 6, 2011. The Defendant offered to extend the time to respond to the Summary Judgment Motion until January 19, 2011. Defendant refused to present the Corporate Designee or Mr. Laughlin on the noticed dates. Thereafter, the Defendant extended the time to respond to this Summary Judgment Motion until February 9, 2011, which extension was confirmed by court order.

Defendant's Vice President of Financial Operations, John Caruso, appeared as the Corporate Designee and was deposed on January 25, 2011. *A transcript of the 30(b)(6) Deposition is incorporated herein by reference, but is not supplied in order to comply with Local Rule 26.2.* The 30(b)(6) Corporate Designee was presented to only address a limited number of the noticed topics, and no other person was presented by Defendant on January 25, 2011 to respond to the designated topics. *See 30(b)(6) Deposition Transcript pp. 20 through 39 attached as **Exhibit 1**.* The Deposition of Mr. Laughlin was canceled by Defendant due to inclement weather and rescheduled to February 3, 2011. The Deposition of Mr. Caruso in his individual officer position was scheduled to be taken on February 2, 2011. Defendant unilaterally rescheduled (again) the depositions of Mr. Caruso and Mr. Laughlin[1]. Plaintiff noticed eight (8) depositions on December 30, 2010. As of February 8, 2011, the only deposition of Defendant witnesses that has occurred is a partial 30(b)(6) deposition. Discovery is presently scheduled to end on April 1, 2011.

4

### III. STATEMENT OF FACTS

1. **Background of Plaintiff Louis Wetmore, Triad Packaging, Inc. and Third Party Defendant Durham Box Company, Inc. d/b/a Merit Container.**

Plaintiff Lou Wetmore ("Wetmore") is and was the majority shareholder and an officer of Plaintiff Triad. Wetmore is and was the majority shareholder and an officer of Merit. Each Triad and Merit were businesses that supplied packaging materials to businesses customers located in North Carolina and South Carolina. Because of the nature of the corrugated manufacturing business, regional production and stocking is necessary to meet customer needs. Triad manufactured and sold products to customers in North Carolina. Triad manufactured and sold products to Merit. Merit stocked the products and sold the products to Merits customers in South Carolina. Both Triad and Merit had an established customer base and sales persons to service the existing customers and solicit additional customers.

Merit also had a minority shareholder unrelated to Wetmore. Merit's minority shareholder was Greg Bailes. Facts relating to Mr. Bailes employment contract with SupplyOne (including that SupplyOne did not address Mr. Bailes until September 2008) are relevant for the jury to consider.

2. **SupplyOne's Business and Business Strategy.**

SupplyOne is in the same packaging business as Triad and Merit were. SupplyOne is headquartered in Pennsylvania. SupplyOne has purchased and consolidated the corrugated packaging industry by buying smaller regional companies like Triad and Merit. SupplyOne intends to consolidate the packaging industry by aggressively seeking out and acquiring other packaging companies. *See a page from Defendant's website attached hereto as **Exhibit 2**.*

---

[1] Plaintiff represents that depositions likely would need to be rescheduled due to a snowstorm the week including

Case 5:10-cv-00005-RLV-DCK   Document 41   Filed 02/09/11   Page 5 of 48

SupplyOne's strategy is to "aggressively" seek and acquire other "well established" companies that are "leaders in their local and regional markets"[2].

SupplyOne employs specialized officers to negotiate and implement its acquisition strategy. SupplyOne employs at least two officers exclusively for acquisitions by SupplyOne: (1) Bill Laughlin, Senior Vice President Corporate Development (hereinafter, "Laughlin"); and (2) John Caruso, Vice President of Financial Operations (hereinafter, "Caruso"). Caruso was the Corporate Designee for the first part of the 30(b)(6) Deposition held on January 25, 2011.

Caruso is an experienced acquisitions officer with more than twenty years experience in acquisitions. *See Defendant's 30(b)(6) Deposition Transcript pp. 12-21 attached at Exhibit 3.* Since 2001, Mr. Caruso worked on twelve (12) asset acquisitions for SupplyOne. *See Defendant's 30(b)(6) Deposition Transcript pp. 133-135 attached at Exhibit 4.*

Pursuant to their acquisition strategy, Laughlin pursued acquisition opportunities, negotiated acquisition terms, and drafted and communicated documents including letters of intent, with acquisition targets. Caruso testified that immediately following execution of letters of intent he was to perform "on site" due diligence, coordinate operational acquisition planning and implement integration by SupplyOne following closing. *See 30(b) Deposition Transcript pp. 101 through 109 attached at Exhibit 5.* Important to note, in the **Exhibit 4**, Caruso testified that SupplyOne's practice was for the letter of intent used in SupplyOne's acquisition to be in full force and effect until a date certain SupplyOne provided in the letter of intent. If closing did not occur by that certain date, then the letter of intent was deemed, from SupplyOne's standpoint, to be withdrawn and of no further effect. *See Defendant's 30(b)(6) Deposition pp135 attached at Exhibit 4.*

---

[2] The quoted terms are taken from **Exhibit 2**.

SupplyOne does not measure business performance like a standard packaging company relying on standard accounting practices. SupplyOne's business is managed using "EBITDA" (meaning "Earnings Before Interest, Taxes, Depreciation and Amortization"). *See 30(b)(6) Dep. Test. pp. 220-223 attached at Exhibit 6.* Caruso testified that SupplyOne's acquisition strategy relied on accounting practices that are unusual and different from normal accounting, and that SupplyOne's strategy permits manipulating information for acquisition purposes. *See 30(b)(6) Dep. Trans. pp 225- 231 attached at Exhibit 7.* Caruso testified that the accounting mentality used in acquisition is distinct and different from normal accounting. *See pp. 227 at Exhibit 8.* Caruso testified that the accounting for EBITDA and standard profit accounting are different. *See 30(b)(6) Dep. Trans. pp.257-258 attached at Exhibit 9.* There are numerous other specific details of SupplyOne's acquisition practices. For the purposes hereof, Plaintiff's summarizes that SupplyOne uses a proprietary, complex acquisition strategy that it does not disclose to sellers that even an ordinary accountant cannot understand.

### 3. Negotiations to Purchase Trial and Merit – November 2007 through April 14, 2008.

Laughlin was the primary contact with Wetmore during most relevant time periods. Wetmore and Defendant began discussions regarding the potential sale of Triad's business assets (not stock) on November 27, 2007. *See ¶ 14 of the Complaint, also see emails SOE 000464 – SOE 000465 attached hereto as Exhibit 10 and SOE 005793 – SOE 005799 attached hereto as Exhibit 11.* Lou Wetmore provided Laughlin with financial information for Triad and Merit on or about November 27, 2007. *See Exhibit 11.* Laughlin evaluated purchasing Triad and Merit as a "bolt on" acquisition to SupplyOne's North Carolina operations already located in Rockwell, North Carolina (hereinafter, "Rockwell"). Laughlin prepared a "Memorandum" and "financial analysis", and sent such to SupplyOne's Chief Executive Officer (Bill Leith, hereinafter,

7

"Leith") and the Chief Financial Officer (Jack Keeney, hereinafter, "Keeney") on November 29, 2007. *See Exhibit 11*. Discussions continued between Laughlin and Wetmore through the beginning of April 2008, with Plaintiff sending Defendant all of the information (financial and otherwise) that Defendant requested. *See ¶ 2 through 3 of the Wetmore Affidavit attached at Exhibit 12.* SupplyOne's Rockwell operations were operated by three individuals: (1) Forrest Hammer (general manager); (2) George Ruth (operations manager) and (3) Debbi Morgan (financial manager) (together, the "Rockwell Officers"). The Rockwell Officers were involved in analyzing the detailed information provided by Wetmore, and provided detailed plans to Keeney and Laughlin regarding the proposed acquisition as early as March 20, 2008. *See SO 001487-SO001497 attached hereto as Exhibit 13*.

On or about April 13, 2008, Wetmore disclosed to Laughlin that Wetmore had another offer to purchase Triad's business assets. *See Wetmore affidavit ¶ 4 through 7 at Exhibit 12.* Within days of notifying Laughlin of CSC's offer, SupplyOne offered to buy Triad and Merits assets and Wetmore verbally accepted the offer. On April 14, 2008, Bill Laughlin wrote in an email to Leith[3], "[W]e have a deal". *See SOE 5815 – 5816 attached as Exhibit 14*. In that email, Mr. Laughlin states that once the formal letter of intent is in place there will not be any more "significant further negotiations"[4]. *Exhibit 14* evidences all material details of the first contract between the parties were agreed.

On April 17, 2008, Bill Laughlin circulated a "strategic fit memorandum", "draft letter of intent" and "highlights and hurdles for the transaction" to Leith (Chief Executive Officer), Jack Keeney (then Chief Financial Officer) and SupplyOne's board of directors (Robert Brown, Ryan Northington, Noel Strauss and John Brignola). *See email chain SOE 007193-007194 attached at*

---

[3]SupplyOne's CEO with carbon copy to Keeney, Forrest Hammer & George Ruth.
[4] Important to note that nowhere in the email is a reference to the deal being "non-binding".

*Exhibit 15*. Mr. Laughlin states that "I am sending all of this to you at one time, because Lou Wetmore has another offer on the table for his company." Thereafter, the SupplyOne's C.E.O. and all Board Members' approved the First Deal. *See SOE007086 – SOE007088 email chain ending April 18, 2008 attached at Exhibit 16*. On April 25, 2008, Defendant sent a signed Letter of Intent to Plaintiffs. Plaintiff Wetmore signed the Letter of Intent as written by Defendant without change on April 29, 2008 (hereinafter, "LOI") *See the Letter of Intent attached hereto at Exhibit 17*.

### 4. The Letter of Intent Dated April 25, 2008, Signed By Wetmore On April 29, 2008.

The terms of the LOI were drafted by the Defendant[5]. The LOI says "letter summarizes our non-binding proposal....to acquire substantially all of the assets." The LOI states later that there are at least some terms that are binding. *See page 6 of the LOI*. **Further,** in the first paragraph of the "Definitive Agreement" section, says that SupplyOne will begin preparation of a definitive asset purchase agreement. However, SupplyOne's language reserves changes only to "[t]he final representations and warranties [which will]...be formulated upon completion of due diligence." There is no reservation of a right to change the purchase price, scope of the offer or other terms in the LOI. Further, **the LOI does not contain**: (1) a **Material Adverse Change** clause permitting the LOI to be changed or terminated if there is material adverse change in the business or market; (2) a **merger clause** which excludes (a) prior agreements; (b) verbal terms and conditions or (c) verbal terms not included in the written terms; or (3) a **form of amendments clause** requiring that amendments to agreement be exclusively in writing signed by both parties. The LOI acknowledges that there are other applicable terms not included in the

---

[5] Defendant drafted the Letter of Intent and is responsible for the language. Any ambiguity, therefore, should be resolved against Defendant. See *Reichold Chem., Inv. v. Goel*, 146 N.C.App. 137, 153, 555 S.E.2d 281, 291 (2001); see also *Washburn v. Yadkin Valley Bank & Trust Co.*, 660 S.E.2d 577, 583 (2008).

9

LOI. The only language relating to integration and amendment appears on page 6 of the LOI in

the "*Non-binding Nature of this Letter*" section, which states:

> "The parties have determined that this letter is non-binding and
> will serve as a guide to the negotiation and preparation of the
> definitive agreement. *It is further understood that this
> proposal constitutes a statement of our present mutual
> intentions with respect to the proposed transaction and does
> not contain all matters upon which agreements must be
> reached in order for the transaction to be completed.* With
> exception of the agreements contained herein under the
> paragraph headings "Confidentiality", "Non-solicitation and
> "Professional Fees", as to which each party hereto intends to be
> legally bound, none of the parties hereto shall be bound to the
> other in the absence of an executed definitive agreements. **If a
> definitive agreement has not been executed on or before
> July 31, 2008 (or if this letter is terminated sooner),**
> however, the agreements contained under the paragraph "Non-
> solicitation" shall expire and be of no further force and effect,
> except that the agreement of SupplyOne contained in the last
> sentence of that paragraph shall not expire and shall continue in
> full force and effect.
>
> If the foregoing proposal meets with your approval, please
> date, sign and return the enclosed copy of this letter. If this
> letter has not been signed and returned on or before April 30,
> 2008, however, the proposal contained herein shall be deemed
> to have been withdrawn by SupplyOne."

The LOI does not preclude amendment to the vague and ambiguous above quoted language by

verbal representations or other writings[6].

### 5. Contemporary Statements Made To Wetmore and Merit Container Side Letter.

Prior to receiving the LOI, Wetmore was informed that the documentation was standard,

and that the only thing that would be necessary to close the transaction was confirmatory due

---

[6] Failure of the parties to follow through with their intention to reduce the agreement struck to writing does not
prevent the underlying oral agreement from binding the parties. See *Williams v. Jones*, 322 N.C. 42, 366 S.E.2d 433
(1988).

diligence by SupplyOne and his resolution of issues with a third party supplier called Pinnacle[7]. In addition, Wetmore discussed the "non-binding" language in the LOI with Laughlin. Laughlin convinced Wetmore that they had a deal, and that the language was used only in the event confirmatory due diligence revealed previously undisclosed matters.

In addition to the LOI, SupplyOne also provided Wetmore with a side letter dated April 25, 2008 relating to Third Party Defendant Merit ("Merit Side Letter"). *See Exhibit 18 attached hereto*. The Merit Side Letter was drafted by SupplyOne, and refers to the LOI (but does not incorporate by reference the terms of the LOI). The Merit Side Letter states, "[o]f the total purchase price we are offering, $600,000.00 relates to Merit." There is no language identifying that any portion of the Merit Side Letter is non-binding.

### 6. Promised Immediate Due Diligence and Events Preceding the July 31, 2008 Closing Date.

Despite unconditional language in the LOI to promptly begin due diligence and prepare a definitive agreement, Defendant did neither. Within a week of receiving diligence materials from Wetmore, Laughlin began pressuring Wetmore to immediately resolve issues with Pinnacle before further due diligence, and requested Wetmore indemnify SupplyOne for costs associated with due diligence should issues between Triad and Pinnacle not resolve prior to closing. On June 3, 2008, Laughlin wrote to Leith that "[a]t this point, he is not in my opinion, sufficiently desperate to give us such an indemnity – but he may be within a month or two if Pinnacle is unresolved and we threaten to walk". *See SOE006236 attached at Exhibit 19*. Wetmore recalls that Laughlin asked for either an indemnity or to extend the closing date. Wetmore expressed to Laughlin that extending the closing date past July 31, 2008 was not acceptable due to problems

---

[7] "Also, prior to closing, the Companies must have been relieved of any obligations under the Pinnacle requirements supply agreement, or the Pinnacle owners must agree to reduce the requirements supply agreement to 8 mmsf/month, a the lowest pricing that SupplyOne pays to any of its suppliers.

that arose resulting from disclosure that SupplyOne was purchasing Triad. Wetmore would consider the indemnity. *See ¶ 16 and 17 of the Wetmore Affidavit attached at Exhibit 12*. On June 16, 2008, Laughlin wrote to Leith referencing that SupplyOne had not started due diligence, and further stating that Lou "believes we will close." *See SOE006038 attached at Exhibit 20*.

SupplyOne recognized that Triad and Wetmore were becoming more dependant on SupplyOne's offer. In an email dated July 2, 2008, SupplyOne's Chief Financial Officer (Jack Keeney) wrote to Bill Laughlin that "I believe that raises questions as to whether this deal makes sense, particularly since Triad is losing Ethan Allen, its largest customer. I think we need to decide this quickly, before Lou exists his board deal with Pinnacle. In the event we decide not to go forward, we don't want to leave him with no supplier." *See SOE 474 to 476 attached at Exhibit 21*. Laughlin responds stating that "[L]ou is no longer buying from Pinnacle[.]" At this point, Wetmore had already relied on SupplyOne "pressure" regarding Pinnacle, yet no one informed Wetmore that there was any concern, and SupplyOne continued to assert that closing was on schedule for July 31, 2008. *See Wetmore Affidavit ¶ 15through 21 at Exhibit 12*. In the weeks leading up to July 31, 2008, Wetmore inquired of Laughlin regarding the closing logistics, and Laughlin expressed that he did not believe that closing would happen on July 31, 2008 due to scheduling conflicts. *See Wetmore Affidavit ¶ 22 at Exhibit 12*. At that time, Laughlin promised to close in August, but was not specific as to a date certain. *See Wetmore Affidavit ¶ 22 at Exhibit 12*.

### 7. Due Diligence Started After July 31, 2008. The Second Week of August 2008, Until September 11, 2008 and the Terms of the New Deal.

Despite having already prepared detailed financial analysis and operational plans, SupplyOne began another round of "diligence" during the preceding week in August 2008. *See*

12

*SO001463 attached at **Exhibit 22**.* Absent any other facts, the Letter of Intent was no longer in force and effect if closing did not happen by July 31, 2008.

Around the same time as Keeney's email, in August 2008, CEO Leith came to Triad's Business and addressed Wetmore and all employees. *See the Wetmore Affidavit ¶ 27 at **Exhibit 12**.* In that presentation, Leith stated that SupplyOne was buying Triad Packaging and that closing would happen no later than September 15, 2008. Wetmore recalls that was the first day he discussed the closing date unilaterally being pushed back from August and such being set for September 15, 2008.

On or about September 4, 2008, Laughlin notified Wetmore for the first time that SupplyOne was not going to close and that no deal could be had unless new terms were agreed. *See Wetmore Affidavit ¶ 29 through 31 at **Exhibit 12**.* Wetmore attempted to negotiate, and did negotiate changes to certain less material compensation terms with Laughlin. *See the Wetmore Affidavit ¶ 33 and 34 at **Exhibit 12**.* Under duress and without other option, Wetmore agreed to SupplyOne's newly demanded deal terms (including lower purchase price and reduced net asset threshold) on or about September 8, 2008. At that time, closing would occur no later than September 30, 2008. All discussions were verbal. There were no terms of the new deal terms requiring a more definitive agreement, but discussions were had that the parties lawyers should make closing arrangements. *See the Wetmore Affidavit ¶ 35 at **Exhibit 12**.*

### 8. September 9, 2008 until October 8, 2008.

The revised deal terms were initially intended to be documented in a LOI only. *See SOE 7233 through 7234 attached at **Exhibit 33**.* Laughlin began internal circulation drafts of a detailed "Asset Purchase Agreement" on September 11, 2008, and confirmed via email that the agreement was ready to send to Wetmore. *See SOE 6300 through 6303 attached at **Exhibit 24**.*

13

On September, SupplyOne's lawyer sent Wetmore the first draft of a proposed Asset Purchase Agreement[8]. *See Exhibit 25*. Wetmore reviewed the new, proposed Asset Purchase Agreement and determined that it contained many new terms that had previously not been discussed. *See the Wetmore Affidavit ¶ 37-38 at Exhibit 12*. Among other issues, the purchase price in the Initial Proposed APA was not correct. *See page of the Draft Asset Purchase Agreement Exhibit 25*. Wetmore responded by sending back a substantially reduced document which he believed was more in the spirit of what had been agree. *See Exhibit 26 attached hereto*. SupplyOne refused to accept Plaintiff's proposed changes and insisted that only minor changes be made to SupplyOne's proposed document. Thereafter, the parties negotiated changes to a limited number of provisions. The number of different revisions to the APA, including changes to the material terms of deal, purchase price and net asset calculations, of the proposed Asset Purchase Agreement amounted to at least five (5) different versions.

On September 29, 2008, Caruso wrote that in reference to the "Strategic Fit"[9], "[W]e normally do not make reference to the escrow in the Strategic Fit but in this case I will put it in as well as the amount of the Subordinated Debentures as we have the settlement for uncollected AR and unsold inventory after 6 months." And further states, "[A]ddditionally, the way I read the document the bulk of the reduction will not be ours until 6 months after close when we settle up on receivables and inventory." *See SOE 005579-005580 attached at Exhibit 27*. This shows SupplyOne's intent to reduce the amount to be paid by demanding offsets in six (6) months. Wetmore is not copied to the email.

---

[8] Despite proof of internal approval by SupplyOne including the Board of Directors, the email states, "Our client has not had the opportunity to fully review the draft, and accordingly, we reserve comments or changes they may have".
[9] Referring to the Strategic Fit Memorandum, the same document presented to the Board of by Laughlin via email dated April 17, 2008 and which is submitted to the Board for deal approvals as part of their process.

14

Up until the last versions of the Asset Purchase Agreement, accounts receivable for a customer identified as AP Exhaust were included in the assets to be transferred[10]. At all times relevant to the AP Exhaust receivable[11], a lawsuit to collect the Accounts Receivable had been filed and SupplyOne's offers had been made when such lawsuit was pending. In the later versions of the proposed asset purchase agreement, SupplyOne identifies that SupplyOne does not desire to purchase the AP Exhaust Accounts Receivable, and requires Triad to keep those accounts receivable (and corresponding net assets). In conjunction with the closing and the provisions of the final version of the Asset Purchase Agreement, the parties determined the amount of the AP Exhaust receivable would be deducted from the Purchase Price and the net assets would be reduced by the same amount at closing, and the amount paid by Defendant at closing reduced accordingly. *See "Funds Flow Memorandum" attached hereto as **Exhibit 28**.*

*At no time did any of the proposed versions advanced by SupplyOne contain any language releasing SupplyOne for liability arising prior to the date of the final Asset Purchase Agreement. There was never any release of liability relating proferred or advanced by SupplyOne, and no release was agreed.*

### 9. Selected Material Terms of the October 8, 2008 Asset Purchase Agreement, And SupplyOne's Failure To Comply With Those Terms. October 9, 2008 until December 28, 2009.

Pursuant to the Final Asset Purchase Agreement dated October 8, 2008 ("Final APA"), SupplyOne took possession of the assets, its financial information and tool control of the business. SupplyOne began efforts to shut down the operations in Conover, North Carolina and move the equipment, computers and other assets to Rockwell, North Carolina. SupplyOne became responsible in all regards for financial data, reporting, accounts receivable and inventory.

---

[10] AP Exhaust was disclosed prior to the LOI signing.
[11] Lawsuit was filed December 11, 2007.

### A. APA Section 2.7(a) Duty To Provide 60 Day Balance Sheet

Pursuant to Section 2.7(a) of the Asset Purchase Agreement, SupplyOne was required to provide a GAAP prepared balance sheet to Wetmore no late than 60 days following the Closing Date[12]. SupplyOne did not send the 60 Balance Sheet to Wetmore. It appears that SupplyOne began internal discussion discussing a "proposed" Opening Balance Sheet prepared by SupplyOne Rockwell on or about January 26, 2008. *See SOE 001543 attached at **Exhibit 29***. On January 28, 2009, Caruso had not shared the Opening Balance Sheet with Wetmore, writing, "I will be in touch for how we want this presented to Lou Wetmore." *See SOE 000859 – 000863 attached at **Exhibit 30***. Wetmore does not recall receiving any similar balance sheet or other detailed analysis before April 8, 2009. *See the Wetmore Affidavit ¶ 42 through 45 at **Exhibit 12***.

### B. APA Section 2.7(b) Duty to Provide 180 Day Uncollectible Accounts Receivable and Obsolete Inventory Claims

Although Plaintiff attempted to remove the language from the APA[13], SupplyOne insisted that 2.7(b) contained a provision requiring that 180 days from closing that SupplyOne provide a statement to Wetmore regarding "uncollectible accounts receivable" and "obsolete inventory". SupplyOne did not provide such statement on or about 180 days. SupplyOne first notified Wetmore of its claims via letter dated and mailed May 20, 2009. *See Wetmore production attached at **Exhibit 31***.

### C. APA Section 6.11 – Post Closing Access to Information.

SupplyOne exclusively drafted the language of Section 6.11 requiring both parties have reasonable access to information post-closing. SupplyOne did not provide Plaintiff with information reasonably requested following closing. SupplyOne moved all the assets and prevented Wetmore from access. On July 10, 2009, Wetmore emailed a letter to Caruso

---

[12] Sixty (60) days following Closing was December 7, 2008.

requesting details of the efforts to collect accounts receivables and to sell the inventory[14]. *See SOE000896-000899 attached at **Exhibit 32**.* Caruso denied Wetmore access to information. *See SOE000896-000899 attached at **Exhibit 32**.* Without receiving the requested information, Wetmore met with Caruso and Laughlin on at least one occasion, in which SupplyOne continued to assert its demands of May 20, 2009.

### 10. Negotiations to Attempt to Resolve Differences in Claim Amounts

After receiving the claim notice on May 20, 2009, Wetmore began efforts to resolve differences. Wetmore notified SupplyOne of several issues, to which Laughlin wrote to Caruso that he acknowledged his belief that the Net Asset "thresholds" were lowered, but not finding any proof of such. *See email string starting on bottom of SOE001548 to SOE001549 attached at **Exhibit 33**.* Caruso responded by acknowledging that SupplyOne must concede some of Wetmore's claims and stating that argument should still be advanced with relation to other Wetmore positions. *See SOE 1548 at **Exhibit 25**.* On June 16, 2009, Forrest Hammer (General Manager of SupplyOne Rockwell) wrote to Wetmore:

> "I do not feel that it is our obligation to assist with any collections or payments for the sale of Triad receivables or inventories since this would clearly constitute a conflict of interest with a SupplyOne customer. You should discuss this with John since I was not a party to any of the contracts between you and SupplyOne. It could be that we need to participate and Rockwell needs to understand this. Please let me know if you feel or know that I am incorrect with this so that we can provide the necessary help to meet our contractual obligation". *See the Wetmore Affidavit at **Exhibit 12**, referring to **Exhibit D**.*

During this same timeframe, Caruso continued to insist that Wetmore conceded on all SupplyOne's claims relating to Accounts Receivable and Inventory. Wetmore requested on two occasions that the parties mediate pursuant to APA section 12.8. *See the Wetmore Affidavit ¶ 52*

---

[13] *See Wetmore production pp. 493 attached at **Exhibit 17**.*

[14] SupplyOne had a duty to use best efforts to collect Accounts Receivable (APA ) and Sell Inventory (APA )

17

*at Exhibit 12*. SupplyOne failed to respond to the requests for mediation and lawsuit was filed on December 28, 2009.

## IV. STANDARD OF REVIEW

### A. Summary Judgment Standard.

Summary Judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary Judgment is proper only where "there is no genuine issue as to any material fact" and the moving party is "entitled" to judgment as a matter of law." See *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir.2007). The Court must view the evidence in the light most favorable to non-moving party (i.e. – Plaintiff) and draw all reasonable inferences in Plaintiff's favor. *See Dennis v. Columbia Collerton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir.2002), also see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The must construe the facts in the light most favorable to the non-moving party, and the Court may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435 (4th Cir.2001). The moving party has the burden of showing-"that there is an absence of evidence to support the nonmoving party's case." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is a drastic remedy. The purpose is to save time and money for litigants in those instances where there is no dispute as to any material fact. See *Dendy v. Watkins*, 288 N.C. 447, 219 S.E.2d 214 (1975).

Allegations of fraud do not readily lend themselves to resolution by way of summary judgment because a cause of action based on fraud usually requires the determination of a

18

litigant's state of mind. See *Johnson v. Owens,* 263 N.C. at 758, 140 S.E.2d at 314, citing

*Fogarty v. Security Trust Co.,* 532 F.2d 1029 (5th Cir. 1976); *Weiss v. Kay Jewelry Stores, Inc.,*

470 F.2d 1259 (D.C.Cir.1972); *American Nat. Bank & Trust Co. of Chicago v. Certain*

*Underwriters* at Lloyd's of London, 444 F.2d 640 (7th Cir. 1971). A litigant's state of mind is

seldom provable by direct evidence but must ordinarily be proven by circumstances from which

it may be inferred. See *State v. Bell,* 285 N.C. 746, 208 S.E.2d 506 (1974). This renders

summary judgment inappropriate in a fraud case where the court is called upon to draw a factual

inference in favor of the moving party; or where the court is called upon to resolve a genuine

issue of credibility. See *Kubik v. Goldfield,* 479 F.2d 472 (3d Cir. 1973); *Associated Hardware*

*Supply Co. v. Big Wheel Distributing Co.,* 355 F.2d 114 (3d Cir. 1966); see generally 6 Moore's

Federal Practice P 56.17(27) (1980).

## V. ANALYSIS AND ARGUMENT.

### 1. DEFENDANT SUPPLYONE MADE NUMEROUS FRAUDULENT MISREPRESENTATIONS AND COMMITTED OTHER FRAUDS ON NUMEROUS OCCASIONS FRAUD FROM APRIL 2008 THROUGH DECEMBER 2009. PLAINTIFFS HAVE BEEN DAMAGED IN EXCESS OF $600,000.00 AS A RESULT.

#### A. Standard of Review for Fraud Generally.

North Carolina's Supreme Court consistently finds that "[F]raud has no all-embracing

definition and is better left undefined lest crafty men find a way of committing fraud which

avoids the definition, the following essential elements of actionable fraud are well established:

(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive,

(3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to injured

party." See *Ragsdale v. Kennedy,* 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); affirmed *by*

*Forbis v. Neal,* 361 N.C. 519, 649 S.E.2d 382 (2007). Fraud may be actual or constructive. *See*

19

*Forbis v. Neal,* 361 N.C. 519, 649 S.E.2d 382 (2007); also see *Watts v. Cumberland County Hosp. Sys., Inc.,* 317 N.C. 110, 115, 343 S.E.2d 879, 883 (1986). Reliance on the allegedly false representations must be reasonable. See *Johnson v. Owens,* 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965). The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion. See *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP,* 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999). It is sufficient if fraudulent intent may reasonably be inferred, presumed, or necessarily results from the facts alleged. See *Cotton Mills v. Manufacturing,* 218 N.C. 560, 562, 11 S.E. 2d 550, 551 (1940).

### B. SupplyOne Has a Duty Not to Intentionally Misrepresent Information As Well As a Duty Disclose Material Information.

In the course of the initial due diligence and negotiations prior to the LOI, SupplyOne had a duty to truthfully reveal information and not make untrue representations. The specific duty of full and fair disclosure in circumstances involving buyers and sellers of businesses in an acquisition transaction is recognized by North Carolina. *See Kindred Of North Carolina, Inc. v. Bond* 160 N.C.App. 90, 584 S.E.2d 846 (2003)*; also see Libby Hill Seafood v. Owens,* 62 N.C.App. at 698, 303 S.E.2d at 568. Further, "[e]ven if there is no duty to disclose information, if a seller does speak then he must make a full and fair disclosure of the matters he discloses." *See Godfrey v. Res-Care, Inc*, 65 N.C.App. 68, 598 S.E.2d 396 (2004) quoting *Freese v. Smith,* 110 N.C.App. 28, 35, 428 S.E.2d 841, 846 (1993). A duty to disclose arises in an arm's length negotiation where one party has taken affirmative steps to conceal material facts form the other. See *Ragsdale v. Kennedy*, 286 N.C. at 139-40, 209 S.E.2d at 500-01 (1974). Under the circumstances described, law recognizes a duty to truthfully disclose and duty to not misrepresent.

20

Further, SupplyOne had contractual duties that arose following both the execution of the LOI as well as very specific contractual duties that arose from the APA. Further, "[I]n every contract, three is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. See *Williams v. Craft Dev., LLC,* 682 S.E. 2d 719, 723 (N.C.Ct. App 2009). These duties are heightened when facts reveal dependency relationships, such as the dependency that arose by continued promises to close by July 31, 2008, which promises were made to Wetmore on several occasions after June 1, 2008. Intentionally setting timeframes that cannot be reasonably met has been acknowledged, even in a single instance, to be both fraud and an unfair trade practice. *See Bolton Corporation v. T.A. Loving Company, 94 N.C. App 392, 380 S.E. 2d 796 (1989).* When, as here the superior party obtains a possible benefit through the alleged abuse of the confidential or fiduciary relationship, the aggrieved party is entitled to a presumption that constructive fraud occurred. *Watts,* 317 N.C. at 116, 343 S.E.2d at 884; *McNeill v. McNeill,* 223 N.C. 178, 181, 25 S.E.2d 615, 617 (1943).

### C. Fraud To Induce Plaintiff To Rely Exclusively On SupplyOne.

The details of Defendant's actions reveals numerous of fraudulent misrepresentations which reflects a strategy used by companies that are experienced in acquisitions. The practice of fraudulent representations and omissions causes a target company to become so reliant on SupplyOne that there are no reasonable alternatives. The representations include promises of definite closing date and promises of closing certainty. Once the target has no other option, SupplyOne negotiates a new deal for less money and onerous terms. The timing of when actions are promised and when actions are taken (if at all) is important. After entering into the new agreement, and closing, SupplyOne takes possession of the business and assets. SupplyOne does

21

not perform its contractual obligations, but seller has no option to cause Purchaser to perform, and SupplyOne further reduces the purchase price.

## 1. The Letter of Intent was Expressly to Keep Wetmore from Selling the Business to Another Buyer

As set forth in the email dated April 17, 2008, *see SOE 007193-007194 attached at Exhibit 15*, Laughlin expressly states that the purpose of the document was to have Wetmore rely on SupplyOne rather than sell to another party. Wetmore was not told that SupplyOne provided him an offer just to stop his discussions with CSC. *See Affidavit of Wetmore ¶ 9 attached at Exhibit 12.* Laughlin did not tell Wetmore that the LOI was just to make sure he wouldn't sell to someone else. However, it was clearly SupplyOne's intention to prevent Wetmore from continuing discussions with CSC. The "Non-solicitation" provision of the LOI states:

> "The Shareholders further agree that while this letter is in effect, none of the officers, directors or employees of the Companies will undertake or continue acquisition discussions with any other party and that both they and similar representatives of SupplyOne will not disclose the terms of this proposal to anyone other than duly authorized representatives. In addition, for a period from the date of this letter until the earlier of the date on which this letter terminates and July 31, 2008, the Companies the Shareholders shall not solicit, or engage others to solicit, offers for the purchase or acquisition of all or any substantial part of the assets of the Companies or for any merger or consolidation involving the Companies, and they shall not negotiate with or enter into any agreements or understandings with, or provide information to any other person with respect to any such transaction.

Following signing the LOI, SupplyOne did not start due diligence or the other promises. SupplyOne forced Wetmore into positions he was otherwise not obligated to address, such as Pinnacle. There is no requirement in the LOI to resolve Pinnacle prior to close. Yet, SupplyOne used that issue to make Plaintiff desperate and force unreasonable terms. *See SOE 006236, attached at Exhibit 14.*

22

SupplyOne did not promptly begin due diligence as set forth in the LOI, but rather, either waited until at least August 4, 2008 to begin any post-LOI diligence or lied about when diligence occurred. On August 12, 2008, Mr. Laughlin acknowledged the detrimental reliance of Wetmore that SupplyOne caused, when he stated that Lou had become more flexible at this point because SupplyOne was his only options. *See SOE 001564-001565, attached at **Exhibit 34**.*

> **2. Defendant Fraudulently Represented Time Frames Including the July 31, 2008 Closing Date. Defendant Intentionally Created Delays Through No Fault of Plaintiff Including Representing That Further Due Diligence Was Necessary.**

Caruso testified that post-LOI Due Diligence should start within one week of signing the LOI. *See 30(b)(6) Dep. Test. pp. 102 through 108 at **Exhibit** 35.* That did not happen. Defendant did not even begin internal discussions regarding further due diligence until June 20, 2008 (more than 2 months after Mr. Laughlin's "We Have A Deal" Email). *See SOE 000264-000267 attached at **Exhibit 35**.* In fact, Defendant did not have any internal discussions regarding the Post LOI Due Diligence until July or August 2008 (at the earliest). *See SOE 5852-5853 attached hereto as **Exhibit 36**.* Further, it appears from this email string Mr. Laughlin suggests August 2, 2008 (after the LOI was rescinded) to meet, and to meet before 10:30 in the morning because Mr. Laughlin starts drinking at 10:30 am. Caruso could not identify when the Post LOI Due Diligence list was sent. The Exhibits referenced herein demonstrate that the Post LOI Due Diligence certainly did not begin promptly but rather, began more than three (3) months later and AFTER from Defendant's perspective the LOI was no longer valid. The email attached at reveals that the Post LOI, onsite Diligence was actually started at the earliest on August 4, 2008. *See **Exhibit 22**.* By the Defendant's own standards of promptness, the Defendant did not perform, and combined with Wetmore's testimony that numerous times after

23

the LOI, Laughlin told Wetmore that everything was progressing to a July 31, 2008 close, the fraud and intentional detrimental reliance is obvious.

### 3. Promise to Prepare and provide a "definitive asset purchase agreement to document the transaction."

The words of the LOI were drafted exclusively by SupplyOne. Defendant circulated the proposed Letter of Intent and received approvals from the Senior Officers and Board of Directors. *See Exhibit 16.* Under the circumstances, it appears that Defendant chose its own words carefully. North Carolina law requires that ambiguity in the language be interpreted against the drafter. The first sentence under the section "Definitive Agreement" is important. That sentence states, "Upon execution of this letter of intent, SupplyOne will begin the preparation of a definitive asset purchase agreement to document this transaction."

The words state two important points: (a) SupplyOne was to begin preparation immediately, (which SupplyOne did not), and (b) the definitive asset purchase agreement referenced in that sentence was to "document this transaction", not document a subsequently negotiated new deal between the parties. SupplyOne never did as promised in the LOI and never told Plaintiffs. It is clear that the efforts to draft a definitive asset purchase agreement did not start until September 9, 2009. *See Exhibit 23 and 24.* This is an omission that is important to Wetmore. If he had known that after July 31, 2008 that he would only start discussing new issues and terms, and that SupplyOne would be negotiating for months after presenting the document, Wetmore would not have agreed to the transaction. *See Wetmore Affidavit ¶'s 20 through 23 attached at Exhibit 12.*

24

### 4. Failure to Disclose SupplyOne's Intent to Change Deal Terms or Negotiate a New Deal.

Even assuming *arguendo* hat SupplyOne did not intend misrepresentation from the start, based on the discovery responses provided to Plaintiff, sometime in June 2008 the Defendant began internal discussions about not performing pursuant to the Letter of Intent. *See SOE 006236, attached at Exhibit 19.* SupplyOne did not tell Plaintiff of any hesitance until September. *See Wetmore Affidavit ¶'s 29 through 30 attached at Exhibit 12.* Keeney even discussed that disclosure was necessary to avoid detrimental reliance. Plaintiff Lou Wetmore became ever more concerned about Defendant to perform when they did not timely notify Wetmore about closing on July 31, 2008. In fact, SupplyOne knows it is normal and intends to negotiate material terms after the LOI and always extensively negotiates after the LOI close date. *See 30(b)(6) Deposition Transcript pp. 163-166 attached at Exhibit 37.*

### D. Bill Leith's Fraudulent Promises To Wetmore and Triad's Work Force.

Sometime in early August 2008, the President and Chief Executive Officer of SupplyOne (Bill Leith) visited Triad Packaging's Conover, North Carolina facility. Leith made a presentation to all of Triad's Employees including Wetmore. *See Wetmore Affidavit ¶ 27 at Exhibit 12.* In that presentation, Leith told all Triad employees that the business was being purchased by SupplyOne and that SupplyOne would take over and close before September 15, 2008. This was a promise that SupplyOne did not intend to keep and could not have made. Caruso admitted that the promises made prior to closing, such as the promises made by Leith, were promises that SupplyOne could not keep. *See 30(b)(6) Dep. Test. pp. 290-295 attached at Exhibit 38.* Given the economic conditions and that SupplyOne's already ongoing internal discussions were to seek a reduced purchase price, the representations were clearly fraudulent. Further, Wetmore believed at that time closing was scheduled for before the end of August. *See*

25

*Wetmore Affidavit ¶'s 27 and 28 at **Exhibit 12**.* Based on Leith's statements and the testimony of the Caruso, Plaintiff is entitled to summary judgment on the fraud claims.

### E. Fraud In Inducing Plaintiff To Sign The APA And The Promissory Note.

Defendant intended to cause Plaintiff to agree to APA terms including payment using a Promissory Note, even though Defendant never intended to pay the Note or in good faith resolve issues relating to the Escrow Account. First, in negotiating the terms of the September 2008 New Deal, Wetmore responded with an offer seeking to have all cash and no promissory note at closing. *See ¶'s 30 through 34 of the affidavit of Wetmore attached at **Exhibit 12**.* Mr. Laughlin represented after a few days that SupplyOne's investors had been consulted and would not agree to remove the Promissory Note. Laughlin represented that SupplyOne's investors required all acquisition targets to take a Promissory Note that could be converted into to equity. *See ¶ 33 of the affidavit of Wetmore attached at **Exhibit 12**.* However, we know that the investors are the Board of directors, and the Board of Directors were not contacted regarding the new deal until after it was concluded. *See SOE 6782-6840 attached at **Exhibit 38**.* **Further,** the reason for requiring part of the purchase price be paid in future payments is because SupplyOne intended to further reduce the purchase price by not paying the Note and SupplyOne's intent to demand all amounts escrowed. See ***Exhibit 27**.*

### 1. SupplyOne never Intended to Pay Wetmore the Full Purchase Price. SupplyOne Intended at the Time of the signing the APA to use the Promissory Note and Escrow to Reduce the Purchase Price Further.

Prior to the execution of the Asset Purchase Agreement (dated October 8, 2008), Caruso alluded in an email that SupplyOne intended to further reduce the price of the deal after closing by setting off the amounts of the Promissory Note and making claims against inventory and accounts receivable. *See SOE 005579-005580 attached as **Exhibit** 27*. SupplyOne further

26

committed fraud by stringing Wetmore along claiming that payments couldn't be paid because SupplyOne was in breach of bank covenants. SupplyOne represented on at least two occasions in 2009 that SupplyOne could not make the approximate $1,000 interest payment on the Promissory Note because SupplyOne was not performing in compliance with Bank Covenants. *See Wetmore production pp. 347 attached at **Exhibit 40***. Further, Caruso testified that SupplyOne continued to acquire businesses in the same time frame. *See 30(b)(6) Deposition Testimony pp. 160-161 attached at **Exhibit 41***. The jury will determine that SupplyOne's failure to make the Promissory Note payments was not genuine and fraudulent. In virtually identical disputes in acquisition contexts, North Carolina law does not permit SupplyOne to set-off Promissory Note payments absent an injunction or court order. See *Kindred Of North Carolina, Inc. v. Bond*, 160 N.C.App. 90, 584 S.E.2d 846 (2003).

Caruso testified that he believed in accordance with the accounting system that Defendant used (FIFO) versus the system used by Plaintiff in the ordinary course (LIFO), that Defendant would be getting part of the purchase price back. **Further,** the Caruso testified that acquisition analysis and accounting methodologies differ from ordinary accounting methodologies for things like inventory. Considering the aforementioned testimony and exhibits, it is clear that *SOE005579-005580* reveals that prior to signing the APA on October 8, 2008, that even as early as September 29, 2008, Defendant never intended to pay Plaintiff pursuant to the Promissory Note and never intended to keep certain amounts of the accounts receivable and inventory. Caruso even testified that he was aware that based on his accounting determination, that prior to close, SupplyOne was buying inventory that it would later tell Plaintiff's was obsolete. SupplyOne made promises to purchase inventory and accounts receivable, that they intended Wetmore to rely on the promises to buy the inventory and accounts receivable, but the

27

SupplyOne never intended to pay Wetmore for the accounts receivable and inventory. It reveals that SupplyOne intended to use the escrowed funds and other adjustment mechanisms in a contract to demand that Wetmore pay them. SupplyOne knew exactly what they were buying at that time, and even submitted this strategy of escrow and subsequent claim to get money back to their board of directors for approval. Due to SupplyOne's claim for the escrowed funds, such funds have not been paid to Wetmore.

### 2. Intentionally Fraudulently and Negligently Represented that Best Efforts were used to collect Accounts Receivable and Sell Inventory.

Following the Forrest Hammer's email dated June 16, 2009[15], Wetmore was contractually entitled to determine if SupplyOne used the "best efforts" required in **section 6.10 of the APA**[16] to collect the accounts receivable. John Caruso states that regardless of what (if any) efforts were used, SupplyOne should stonewall Wetmore's efforts to determine the truth. *See SOE 000896-000899 attached at Exhibit 32.* This email shows that Defendant was willing to ignore the best efforts standard and demand compensation regardless of performance with the contract. Under the circumstances, even between buyers and sellers of businesses, in North Carolina, the parties have an obligation of truthful disclosure of information. See *Kindred Of North Carolina, Inc. v. Bond*, 160 N.C.App. 90, 584 S.E.2d 846 (2003); also see *Libby Hill Seafood v. Owens,* 62 N.C.App. at 698, 303 S.E.2d at 568. Forrest Hammer even admitted in an email to the Plaintiffs, and copied to Mr. Caruso, that SupplyOne had not attempted to collect the account receivable and SupplyOne no intention of trying to collect the same. *See the Wetmore Affidavit Exhibit D attached at Exhibit 12.*

---

[15] *See Wetmore Affidavit's Exhibit D.*
[16] Section 6.10 of the Asset Purchase Agreement states, "Sale of Inventory; Collection of Accounts Receivable. Subject to Section 2.7(b) above, the Buyer shall use its best efforts to sell the Inventory and collect all Accounts Receivable assumed as part of the Purchase Assets."

### 3. SupplyOne Fraudulently Misrepresents the Purchase Price, the Minimum Net Asset Calculation and Intentionally Withheld Information from Wetmore to Prevent Resolution

Defendant's first claim made against Net Asset Deficiency[17] contained known inaccuracies. By combining the known inaccuracies from the **April 8, 2009 Claim**, and the failure to disclose material information (e.g. – change in accounting methodology) and what we now know was an intentional effort to deceive and stonewall Wetmore's efforts to resolve differences in good faith, the Defendant's behavior amounts to fraud in the performance of the Net Asset calculation provisions of the Asset Purchase Agreement. Further, SupplyOne's breach of contract claims and post-closing positions relate to purported failures to deliver minimum Net Assets to SupplyOne. However, Caruso admits that the minimum net asset calculations is not related to SupplyOne's purchase price and thus is not material. *See SOE 001543 attached at Exhibit 29* . Accordingly, the jury will conclude that SupplyOne's position with regard to the minimum net assets following close is fraudulent. Even if a jury decides that such does not amount to fraud in the performance of the contract, the factors and above described evidence are certainly sufficient for jury to decide that the breach of contract was accompanied by aggravating circumstances.

### 4. Fraudulent Representations and Omissions Relating to the Employment Agreement.

#### a. SupplyOne knew at the time of Entering the Employment Contract that SupplyOne could not track sales to compensate Wetmore pursuant to the Contract.

The employment agreement of Wetmore is included in the APA. Based on the representations and discussions leading up to the signing of the employment agreement, Defendant intentionally omitted material information relating to future employment relationship.

---

[17] Made on or about April 8, 2009.

Leading up to the signing of the Agreement, discussions were taking place that Plaintiffs would bring additional national (or at least greater regional) business to the Defendants. However, Defendant did not have at the time and still does not have the ability to track the sales in the manner that is required pursuant to the Employment Contract for Wetmore and Mr. Bailes. *See 30(b) Dep. Tran. Pp 188 through 195 attached at **Exhibit 42.*** Caruso testified that they are working on implementing a system for such tracking. (*ID*). The failure to disclose that SupplyOne could not track the sales is the same kind of fraudulent and negligent misrepresentation in issue in the *Kindred* case cited above. Further, the duty established in *Kindred* likely requires that SupplyOne disclose the annual sales to Triad Accounts to Wetmore without Wetmore offer. SupplyOne intended for Plaintiff Wetmore to rely on representations that it could track and would pay commissions on all sales to Triad Accounts. Wetmore relied on the sales commissions above $8 million, and expected to receive compensation year 1 for those commissions, but has not yet received any information to determine if he is entitled to further compensation. *See ¶'s 48 and 49 of the affidavit of Wetmore attached at **Exhibit 12.*** Further, Wetmore has not received any compensation relating to sales over $8 million. *See ¶ 49 of the affidavit of Wetmore attached at **Exhibit 12.***

### b. Fraud In Performance of Employment Contract

SupplyOne has a contractual duty to pay Wetmore commissions for sales to Triad Accounts over $8,000,000 on an annual basis. SupplyOne has a duty to disclose information necessary for Wetmore to know whether he is being paid. This particularly revealing when the complexity of compensation grids used by SupplyOne in relation to Mr. Bailes employment agreement was assessed by Caruso in reference to Deposition Exhibit 14. *See 30(b)(6) Dep. Trans. pp. 253-259 attached at **Exhibit 45.*** In fact, Caruso could not even decipher some of the

30

measurement criteria that he prepared and acknowledged that the chart evaluating performance must be explained, including its fundamental measurement criteria in order for someone to understand it. Caruso testified that he did not know one way or another whether such was explained to Mr. Bailes. No explanation of such performance measures was provided to Wetmore. *See Wetmore Affidavit at **Exhibit 12***. It is obvious that based on the complexity and control of the information necessary to evaluate compensation creates the opportunity for manipulation and fraud in calculating the same. Failing to disclose such in its entirety to Wetmore amounts to fraud in the inducement, and then failing to pay in accordance with objectively gathered and measured performance data amounts to breach of contract accompanied by undisclosed fraud.

## 2. SPECIFIC ACTS AND OMISSIONS BY SUPPLYONE RELATING TO PLAINTIFFS AS WELL AS SUPPLYONE'S ACQUISITION PRACTICES AMOUNT TO UNFAIR TRADE PRACTICES.

Chapter 75 of North Carolina General Statutes prohibits unfair acts which undermine ethical standards and good faith between persons engaged in business dealings. *See McDonald v. Scarboro,* 91 N.C.App. 13, 18, 370 S.E.2d 680, 683, *disc. review denied,* 323 N.C. 476, 373 S.E.2d 864 (1988). In order to establish a claim under N.C. Gen.Stat. § 75-1.1, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *See Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.* Intent is irrelevant to a claim of unfair and deceptive trade practices under N.C.G.S. 75-1.1. *See Wilder v. Squires,* 68 N.C.App. 310, 315 S.E.2d 63 (1984). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive,

31

unscrupulous, or substantially injurious to consumers." *See Marshall v. Miller,* 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). "A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position." See *Johnson v. Phoenix Insurance Co.,* 300 N.C. 247, 264, 266 S.E.2d 610, 622 (1980), overruled on other grounds by "An act or practice is deceptive ... if it has the capacity or tendency to mislead or creates a likelihood of deception *Id.* at 265, 266 S.E.2d at 622; also see *Poor v. Hill,* 138 N.C.App. 19, 28-29, 530 S.E.2d 838, 845 (quoting *Overstreet v. Brookland, Inc.,* 52 N.C.App. 444, 453, 279 S.E.2d 1, 7 (1981)).

In a business context, this question is determined based on the likely effect on "the average businessperson." *See Bolton Corp. v. T.A. Loving Co., 94* N.C.App. 392, 412, 380 S.E.2d 796, 808, *disc. review denied,* 325 N.C. 545, 385 S.E.2d 496 (1989). The concept of "unfairness" is broader than and includes the concept of "deception." *See Mitchell v. Linville,* 148 N.C. App. 71, 557 S.E.2d 620 (2001); *See also, Eastover Ridge, L.L.C. v. Metric Constructors, Inc.,* 139 N.C. App. 360, 533 S.E.2d 827 (2000). Good faith is not a defense to unfair trade practice claims. See *Gray v. N.C. Ins. Underwriting Association,* 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

### A. In Or Affecting Commerce.

Defendant's website acknowledges that it intends to consolidate the packaging industry through aggressive acquisitions. *See Exhibit 2*. It is the tactics used by an "aggressive" acquirer that intends to consolidate an industry that are in issue. There is no questions that purchasing a competitors assets in North Carolina and South Carolina, then using those assets to sell to the same customers is in an affecting commerce.

## 1. Use of Deceptive Asset Acquisition Strategies as Compared to Stock Purchase Transactions.

Defendant's Motion and Memorandum attempt to characterize the transactions as securities transactions exempt from North Carolina's Unfair Trade Practice claims. However, *the transaction in issue and twelve of thirteen of SupplyOne's acquisition purchases since 2001 have been of assets, not stock or securities.* Obviously, consolidating an industry by purchasing the assets of a competitor doing business in North Carolina is "in or affecting commerce." Although part of the payment of the purchase price was a Promissory Note which under certain circumstances could have been converted into stock. However, that never happened. Further, there are countless examples of caselaw in North Carolina involving Promissory Notes being at the core of Unfair Trade Practice claims.

### B. Fraud In Or Affecting Commerce Violates N.C.G.S. §75 et. seq.

"[P]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts." See *Hardy v. Toler,* 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975). Such decision has been consistently affirmed in that fraud thereby establishes that unfair or deceptive acts have occurred in violation of G.S. 75-1.1. *See Bhatti v. Buckland,* 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991); *See also, Hardy v. Toler,* 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975) (proof of fraud necessarily constitutes an unfair and deceptive act). Fraud in the inducement necessarily constitutes a violation of Chapter 75 and shifts the burden of proof from the plaintiff to the defendant, which must then prove that it is exempt from Chapter 75's provisions." *See Media Network Inc. v. Long Haymes, Inc.,* N.C.App., 678 S.E.2d at 684 (2009). Further, a breach of contract accompanied by aggravating circumstances amounts to unfair trade practices. *See Eley v. Mid/East Acceptance Corp. of N.C., Inc.,* 171 N.C.App. 368, 614 S.E.2d 555 (2005). The *Eley* case is particularly illustrative in that once SupplyOne took possession of

33

Plaintiff's property, refusals to cooperate have been deemed by law to be an unfair trade practice even in a single instance of less than $10,000.00.

### C. Defendant's Acquisition Practices Intentionally Induce Detrimental Reliance. Then When The Seller Is Desperate, Defendant Negotiates a New Deal with a Reduced Price.

SupplyOne follows a pattern and acquisition practice. The practice includes a pattern of setting closing date expectations, having the seller work towards that deadline, all the while, SupplyOne does not intend to close on that date. Rather, SupplyOne intends to create dependency. SupplyOne uses deceptive promises of closing dates and claims to need additional "due diligence" despite having sufficient information. Caruso testified numerous times that the date set in all twelve of SupplyOne's letters of intent had never been met for any acquisition transaction. *See Dep. Testimony pp.133 through 135, attached at **Exhibit 4**.* Caruso testified that Closing occurred "long after" the Letter of Intent as a result of the extensive due diligence that started after the Letter of Intent. *See 30(b) Dep. Testimony pp. 125-127 , attached at **Exhibit 51**.* Such a testimony reveals that as a practice, the Defendant intentionally sets closing deadlines that as a practice are earlier than Defendant will meet. Intentionally setting timeframes that cannot be reasonably met has been acknowledged, even in a single instance, to be both fraud and an unfair trade practice. *See Bolton Corporation v. T.A. Loving Company, 94 N.C. App 392, 380 S.E. 2d 796 (1989).* Further, the **Bolton** case finds that the standard for evaluating whether the timeframes are reasonable is based on the ordinary business person in the industry standard. Given such standard of evaluation, Mr. Caruso's testimony regarding acquisition accounting being different than ordinary business accounting shows that ordinary business people in the packaging industry and accountants could not reasonably know that closing would be delayed. Neither Laughlin nor Caruso told Wetmore about their practices and procedures to set dates,

34

which Laughlin verbally confirmed on numerous occasions would be met, and then extend closing beyond that date.

The jury will determine that Defendant had practice of setting closing dates that Defendant did not intend to meet, and that the closing date set forth in the LOI and post LOI closing date promises were intended as a practice to cause detrimental reliance and further reduce the purchase price. In this instance, the damages of the detrimental reliance can be evaluated in reference to the (a) intentional prevention of Plaintiff accepting the CSC offer which would've closed months earlier; (b) the Laughlin email referencing making Lou desperate enough to concede deal terms; and (c) a purchase price reduced by a total of more than $600,000.00.

In addition, as another example of the unfair and deceptive nature of SupplyOne's practices, Caruso testified that as a practice, when an acquisition target asked for information about taxes and legal issues, he refused to provide the information. *See 30(b)(6) Deposition Transcript pp. 157-158 attached at Exhibit 1.*

**D. SupplyOne's Pre-Closing Conduct Created an Inequitable Position of Power. SupplyOne's Acts and Omissions Relating to the Letter of Intent and Before September 11, 2008 Amount to Breach of Contract Accompanied by Aggravating Circumstances.**

The language of the LOI is ambiguous at best. A jury is most likely to find that the language is confusing and contradictory[18]. In light of the LOI language, a jury is likely to find that Wetmore reasonably believed he had a contract for SupplyOne to buy Triad's Assets. A jury is also likely to find that Mr. Laughlin's own words **"We have a deal" and email** does not contain any caveat requiring that Wetmore sign non-binding letter of intent. That April 14, 2008 email does state that once a formal letter of intent is entered, that there will not need to be any

---

[18] Consider examples from LOI.

Case 5:10-cv-00005-RLV-DCK   Document 41   Filed 02/09/11   Page 35 of 48

more significant negotiations. Further, that email specifically states that SupplyOne is capable of addressing issues involving Pinnacle on their own. Mr. Laughlin's unequivocal statement, combined with a failure to disclose SupplyOne's acquisition practices and history of never meeting an LOI will allow the jury to conclude Wetmore was fraudulently induced to sign the "non-binding" Letter Of Intent and that the LOI was actually a binding contract.

At that point, regardless of the documents, Wetmore believed and understood that SupplyOne would close by or before July 31, 2008, and that SupplyOne would do what was necessary to close by that date. *See affidavit of Wetmore attached at **Exhibit 12**.* **Further**, both reasonably contemporaneous with signing the LOI and after signing the LOI, Laughlin told Wetmore numerous times that SupplyOne was going to close in accordance with the terms of the LOI. *See affidavit of Wetmore attached at **Exhibit 12***. Despite such representations, Defendant was not performing in accordance with the contract. SupplyOne did not start further diligence. SupplyOne did not prepare or provide a more definitive asset purchase agreement. In Laughlin's words on June 3, 2008, Lou was not "sufficiently desperate" but maybe he would become desperate over time and after SupplyOne threatened to walk. *See SOE 006236, attached at **Exhibit 14***. When SupplyOne created a position of power it capitalized on that position to Plaintiff's detriment.

### 1. SupplyOne's Fraudulent Representations, Acts And Omissions Are Breaches Of Contract Accompanied By Aggravating Circumstances Sufficient To Warrant Determination Of Unfair Trade Practices. Defendant's Efforts to Collect a Minimum Net Asset Number Are Immaterial to the Asset Purchase Agreement and are Deceptive.

SupplyOne's determination of the purchase price paid for Triad was based on EBITDA and management of the business is based on EBITDA, not based on net asset valuations or gross revenues. SupplyOne's business is managed and based solely on the EBITDA performance

36

measure, which does not rely on asset valuations. *See 30(b)(6) Dep. Test. pp. 220 at Exhibit 6.* Recall that Caruso testified that the asset acquisition mentality and standard accounting is different than ordinary accounting mentality. Caruso testified that the kinds of accounting analysis he performed was proprietary, not known to accountants and that he would not share the information. *See 30(b)(6) Dep. Test. pp. 223-231 at Exhibit 45.* Defendants knew that they could not substantiate their inventory claims *See SOE 001548-001549, attached at Exhibit 25.* The testimony shows that bad faith fraud in performing the APA and bad faith attempts to further reduce the purchase price when Caruso's email dated January 26, 2009 admits that the "Net Asset" Calculation has nothing to do with the value that SupplyOne purchased and that. *See SOE 001543 as well as 30(b)(6) Dep. Test. pp. 269-271 at Exhibit 46.* The January 26, 2009 email from Mr. Caruso is consistent with his testimony that traditional accounting treatment of asset acquisitions are irrelevant to a transaction based on EBITDA purchase price calculations. Mr. Caruso is an experienced acquisition officer with a financial background. SupplyOne knew exactly what it was buying, and yet manipulated in many ways the balance sheet, accounting of accounts receivable and inventories after closing to create a fraudulent claim relating to the Net Assets so that SupplyOne could further reduce the price paid for Plaintiff.

Further, Caruso testified that SupplyOne was only concerned with something he referred to as "DSO"s. Caruso testified that Deposition Exhibit 17 was a chart used by Laughlin to try to get the "initial purchase price" for Triad, and that Purchase Price for Triad had nothing to do with accounts receivables. *See 30(b)(6) dep. Test. pp.269-271 attached hereto as Exhibit 46.* That testimony is even more revealing when the Court and Jury consider that Wetmore is not experienced in acquisitions and is not an accountant. Caruso and SupplyOne attempted to manipulate net asset valuations which have nothing to do with the price paid for Triad or the

37

value SupplyOne received, to get additional funds out of Wetmore, by trumping up a Net Asset claim intended to further reduce the purchase price. SupplyOne uses a sophisticated process and understanding of different accounting principles to confuse and manipulate the Seller. Such practices are unfair and have at a minimum, a tendency to deceive.

Perhaps even more demonstrative, the New Deal struck in September 2008 actually resulted in a higher EBITDA valuation than the first deal. *See SOE 006782-6840 attached at Exhibit 39*. This email reveals that SupplyOne was looking for a better deal, and did not negotiate for a proportional reduction in the price as represented to Wetmore, and actually a completely new and better deal from SupplyOne's perspective. The email shows exactly how much more money SupplyOne was making on the deal. The email is sent to the Board of Directors for their approval. It clearly identifies that this was a new proposal (offer) and the Board approved it. It further reveals that Wetmore was anxious and that he hadn't seen this. Mr. Laughlin's belief that Wetmore should get the document sooner rather than later reveals the effect of continuing to string him along was not reasonable. The lost purchase is a damage, and the added value to SupplyOne is a damage.

### 2. Defendant Immediately Took Possession of the Assets, Moved the Assets in approximately 180 days, and Only Then told Plaintiff of an Alleged Minimum Net Asset Deficiency. This Was An Assertion Of An Inequitable Position And Power.

Pursuant to Section 2.7(a) of the Asset Purchase Agreement, and in accordance with language drafted by Defendant, the Defendant was required to provide a GAAP prepared balance sheet no late than 60 days following the Closing Date. Providing the GAAP statement prepared by Seller is a material term of the transaction as it would allow Plaintiff to evaluate the manner in which Defendant purported to calculate the balance sheet (including AR and Inventory values), and to the extent there was any divergence in their calculations, they could have been reasonably

38

investigated and resolved. Defendant did not provide the opening balance sheet until at least 120 days following the January 8, 2009 deadline date. It appears that Defendant completed and possessed the Opening Balance Sheet at least as early as January 28, 2009, and elected to discuss how such should be presented to Wetmore. *See SOE 859-863 attached at* **Exhibit 30.** Plaintiff does not recall that the opening balance sheet was presented to him at any time prior to April 8, 2009. Defendant did not notify Plaintiffs of any concerns until April 8, 2009. At that time, Defendant had already moved, most (if not all) of the assets sold. Plaintiff was severely prejudiced in Plaintiff's ability to confirm whether the calculations that Defendant presented were reasonable. This is an aggravating circumstance.

Had Defendant timely provided any statement alleging a minimum net asset deficiency, then the parties could have stop the moving equipment and inventory. Further, we now know that Defendant immediately changed the inventory calculation method form the LIFO ("Last In, First Out") method to the FIFO ("First In, First Out") accounting methodology. As testified by the 30(b)(6) designee, who was also the party responsible for preparing the *April 8, 2009 Net Asset Analysis*, the change from LIFO to FIFO did substantially change the inventory valuation. *See 30(b) Depo. Test. corresponding to Dep.* **Exhibit 29** *(SOE1880-1882).* Defendant never informed Plaintiff of the change of the accounting methodology, yet Defendant made claims as set forth in the April 8, 2009 Net Asset Analysis that used a different methodology. By failing to disclose such changed methodology, and moving the assets from the Conover location before Wetmore could challenge the Defendant's Net Asset calculations, the Defendant created a situation in which Wetmore was not in a position to reasonably evaluate Defendant's claims, or show contemporaneous proof that Defendant's claims were unreasonable.

Combining the facts that Defendant moved the assets to their own facility and integrated the equipment into their facility, while contemporaneously failing to disclosed changed net asset calculation methodology, Defendant committed fraud as well as created a inequitable position that prevented Plaintiff from reasonably preventing further breaches of contract by Defendant. In addition to the (a) fraud and (b) inequitable position basis for unfair trade practice claims, the above described shows further that the breaches of contract by Defendant were accompanied by (c) aggravating circumstances.

### E. SupplyOne Sent An Invoice in Direct Violation of N.C.G.S. §75.

North Carolina General Statute 75-35 (*attached at **Exhibit 48***) clearly and unambiguously states, "No person engaged in commerce shall in any manner issue any writing which simulates or resembles: (i) a negotiable instrument; or (ii) an invoice, unless the intended recipient has actually contracted for goods, property or services for which the issuer seeks proper payment. Wetmore did not contract for rent or to pay interest. *See ¶ 53 of the affidavit of Wetmore attached at **Exhibit 12.***

Caruso confirmed that he prepared the invoice for the purpose of notifying Wetmore that SupplyOne did not have the space to store the inventory, NOT BECAUSE THERE WAS A CONTRACT FOR THE PAYMENT OF RENT OR INTEREST. *See 30(b)(6) Dep. Test pp. 171 through 179 attached at **Exhibit 49***.

Because this violation of Chapter 75 is so blatant, it is undoubted that Defendant will try to somehow attempt to relate the invoice to the Asset Purchase Agreement and attempt to justify how there is a contract related to this invoice. However, the face of the invoice and the testimony of Caruso shows the improper purpose and direct violation of North Carolina's Chapter 75. Caruso's purpose was to bill for something he admitted there was no contract for---

40

that is, for rent and for interest at SupplyOne's borrowing rate. Wetmore's affidavit is clear, unambiguous and demonstrate that there is no material issue of fact that the invoice was an invoice, that the intended recipient has NOT actually contracted for goods, property or services for which the issuer was not seeking proper payment. Wetmore is damaged and continues to be damaged by pursuing this lawsuit and failure to SupplyOne to release the $175,000.00 in escrow owed to Wetmore.

The invoice was sent AFTER the lawsuit was initiated and was part of the unfair and deceptive practices employed by Defendant. Defendant was clearly on notice that Plaintiff disputed that there was a contract for the first two of the four line items on the invoice. Caruso further testified that there was a contract for the Plaintiff to buy the inventory back after 90 days, but review of the APA shows there is no such contract in the record. *See 30(b)(6) Dep. Test. pp. 171 at **Exhibit 49**. **Further,** the first two line items Defendant asserts on the invoice (that is for inventory and accounts receivable) reflect the fraudulent assertions that Defendant asserts, and for which we know were based on different accounting principles than what is used by accountants normally or businesses operating in the ordinary course of business. **Further,** based on the Caruso's testimony above, the minimum net assets was not important to the purchase price or the value that Defendant was paying for, and thus no jury could find that there is any tie. Further, and perhaps most revealing, the third line item on the invoice is not interest based on adding the two line items above, but rather, interest based on Supply's claim for $289,649 found on Deposition Exhibit 6. *See **Exhibit F** attached to the Wetmore Affidavit at **Exhibit 12**.* Such is not identifiable on the face of the invoice, and thus it is not possible from the face of the invoice to determine what Defendant is attempting to bill Plaintiff for. Further, SupplyOne sent this

41

Invoice only to Wetmore at his house, further revealing the intent to assert a position of power and intimidate Wetmore.

### F. Assertion Inequitable Position and Power

Defendant's practices including fraudulent representations created an inequitable position of power and dependency. Laughlin admits that as of August 12, 2008, SupplyOne was in a position to demand terms because Wetmore had no other option. *See SOE 001564-001565 attached at Exhibit 34*. At that point, SupplyOne waited approximately a month, demanded new deal terms and refused to negotiate. *See Wetmore Affidavit ¶ 33 through 34 attached at Exhibit 12*. Then, even efforts to have the post-September 11, 2008 deal reflect the transaction were rejected. *See Wetmore production pp. 450 through 451 and 476 through 523 attached at Exhibit 50*. Even after all that, Defendant refused to comply with provisions of the APA including 12.8 which required the parties to mediate disputes pertaining to the APA. As set forth in the *Wetmore affidavit*, numerous efforts were made to mediate short of lawsuit, and Defendant refused to even discuss the same. *See ¶ 52 of the affidavit of Wetmore attached at Exhibit 12.*

Further, SupplyOne intended to use and did use is inequitable post-close position to force Wetmore into settling. By June 2009, SupplyOne had already taken possession of Plaintiff's assets. SupplyOne had all the information necessary to resolve the disputes and SupplyOne knew their position of control. In fact, Caruso recommended that SupplyOne not give Wetmore the information he requested to prevent Wetmore from analyzing and reconciling the dispute. *See SOE 000896-000899 attached at Exhibit 32.* As the Defendant was the only party with the information, such refusal was another assertion of inequitable position and in violation of the duties to disclose information discussed in the *Kindred* case. *See Kindred Of North Carolina, Inc. v. Bond* 160 N.C.App. 90, 584 S.E.2d 846 (2003)

In addition, Defendant's eventually told Wetmore that Defendant was not going to make any payments pursuant to the Promissory Note based on a purported set-off theory. North Carolina law does not permit a Promissory Note to go unpaid because one party claims set-off pending resolution of a lawsuit. *See Kindred Of North Carolina, Inc. v. Bond* 160 N.C.App. 90, 584 S.E.2d 846 (2003). Under the circumstances, applying this fact to the other assertions of position and power, the jury will determine that this is another assertion of inequitable position and power by the Defendant. Worst case, these facts are breaches of contract accompanied by aggravating circumstances.

## VI. THE CREDIBILITY OF DEFENDANT'S MATERIAL WITNESS MUST BE EVALUATED BY A JURY.

Issues of Credibility are to be resolved by a jury. Caruso contradicted himself throughout the deposition. Caruso initially testified that Bill Laughlin alone was responsible for drafting and sending the Letter of Intent. **THEN**, later in the deposition acknowledged that he exchanged drafts of the LOI with Mr. Laughlin and even prepared detailed financial analysis that was sent to the board prior to approval by the Board of the LOI. Mr. Laughlin's sincerity and integrity will certainly be an issue for the jury to determine based on his numerous testimony herein and the acknowledged impact alcohol has on his schedule. For example, Mr. Laughlin acknowledges to starting drinking at 10:30 am. *See SOE 5852-5853 attached hereto as Exhibit 36*. Further, Mr. Laughlin's yearly attendance of Oktoberfest in Munich, Germany likely delayed the closing of a multi-million dollar deal for Triad at least a few days to indulge his own drinking indulgence. Wetmore even recalls that Bill Laughlin appeared at a meeting with a laceration that Mr. Laughlin attributed to his drunkenness. *See ¶ 54 of the affidavit of Wetmore attached at Exhibit 12*. The jury will conclude that exculpatory testimony by Laughlin is unreliable.

43

Under the circumstances, regardless of Defendant's trial testimony which may contradict Plaintiff's, the jury will likely determine that Defendant's officers are substance dependent, self-serving lackies of a corporation whose business is to cause dependency of honest businessmen for the purpose of lining their own pockets at any costs. In fact, George Ruth even called programs intended to promote honesty, integrity and morals "a complete waste of time". *See SO 000457 attached at* **Exhibit 52**.

## VII.     DISTINGUISHING THE CASES AND APPLICATION OF DEFENDANT'S CASELAW.

The caselaw cited by Defendant's brief is distinguishable, and Defendant erroneously attempts to apply law to the facts before the court. Further, the present facts as established by the pleadings, the affidavit of Wetmore and testimony of the Corporate Designee are inapposite to the caselaw cited by Defendant.

For example, the Defendant cites Your Honor with regard to *Performance Sales & Mktg., LLC v. Lowes Co., Inc.* The quotation Defendant uses specifically refers to the inclusion of merger clauses in the relevant agreements. However, as set forth above, the first plan of fraud relate to execution of the LOI, which by the terms drafted by Defendant, was not integrated or merged. Further, Defendant's fraud continued after signing the LOI and leading up to the signing of the Asset Purchase Agreement dated October 8, 2008. Further, even assuming that a merger clause is applicable, after signing the APA, Defendant (a) intentionally withheld material information from the Plaintiff, and (b) made material misrepresentations to Plaintiff relating to "best efforts", intending for Plaintiff to rely on such statements and for the purpose of forcing Wetmore to make unjustifiable payments. The breaches of contract which occurred in relation to those material omissions and representations are certainly fraud relating to the non-performance of the APA which a merger clause in the APA would have no effect. There are many other

44

distinguishing facts which must be considered, such as unlike PSM, Wetmore never received the money he was promised, and in addition to the LOI, there were many promises he would receive such up until September 2008. During the same time, there is conclusive evidence that Defendant intended Wetmore to become desperate and Defendant was aware of an intent to negotiate new terms. Combined with the fact that Defendant has never met the date set forth in any of its acquisition related letters of intent, the jury will infer an intentional omission intended to damage the Plaintiffs. The detrimental reliance caused by Defendant in the present facts, including pre-APA and post APA, amount to the same kind of duress discussed by this Court in the *Rose v. Vulcan Materials Co.* case. See Rose v. Vulcan Materials Co., 194 S.E. 2d 521, 536 (1973). **Further,** from a purely legal standard, the standard of review in *Performance Sales & Mktg., LLC v. Lowes Co., Inc.* was a 12(b)(6) standard focused only on the pleadings. In the present motion, the required standard looks to the evidence presented, which because no 12(b)(6) motion was filed, is necessarily a broader scope of review than merely a 12(b)(6) consideration of the pleadings alone.

Further, Defendant cites to *Sullivan v. Mebane Packaging Group, Inc.* for the proposition that fraud when reading the documents would result in discovering the alleged material misstatement. Plaintiffs only refer to the LOI dates as proof of the verbal representations also being made to the Plaintiff. As the LOI does not contain a merger clause (in fact, expressly states there are other terms not included), the verbal representations regarding closing made after the LOI was entered as well as the fraud in the performance of the Asset Purchase Agreement after such was signed. Further, there is no basis to believe Plaintiffs' could have uncovered the information.

Further, Defendant cites to *Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc.* to state that if there was an alternative source that Plaintiff could refer to uncover the fraud, then the reliance was unreasonable. Clearly, in the present claims, Defendant was the only one with relevant information regarding Defendant's acquisition strategy of creating dependence. The evidence cited above shows that Defendant did not notify Plaintiff of their intentions on delaying or their failure to ever meet a deadline set forth in a LOI. In fact, Caruso testified that if asked for material information, in most instances, he would refuse to provide the information. *See 30(b)(6) Dep. Test. pp. 158 through 159 attached at **Exhibit** 53*. Then, the second round of fraud started after Defendant took possession of and moved the assets that Defendant had not yet paid for. Defendant did not provide the required opening balance sheet, and despite acknowledging the Wetmore's inventory valuations must be accepted. Defendant continued to make claims for the inventory Wetmore identified as transferred. There is no doubt that Defendant exclusively possessed the equipment and the information necessary to determine if Defendant was telling the truth. And when Wetmore asked for the information to evaluate whether or not best efforts (if any efforts at all were used), the information was not provided to him, and Caruso actually wrote an email stating the information should not be provided to Wetmore. *See SOE 896 through 899 attached at **Exhibit** 32*. It is clear that in the performance of the Second Deal which is memorialized in the Asset Purchase Agreement, the Defendant intentionally omitted to information to cause Plaintiff to believe that best efforts had been used to collect accounts receivable and sell inventory. Defendant did not use best efforts.

## VIII.  CONCLUSION

Defendant SupplyOne committed fraud to entice a competitor (Plaintiff) to sell Plaintiff's business assets. The record reveals that Defendant's practices used to acquire Plaintiff's business

46

assets are unfair, deceptive and violate N.C.G.S.§75-1 et seq. Defendant's Motion for Summary Judgment as to Plaintiffs fraud and unfair trade practices must be denied.

This the 9th day of February, 2011.

s/ Matthew K. Rogers
Matthew K. Rogers Attorney Bar Number: 26992
Attorney for Plaintiffs and Third Party Defendant
Law Offices of Matthew K. Rogers, PLLC
200 First Avenue N.W., Suite 104
P.O. Box 9096
Hickory, NC 28603
Phone: (828) 327-2005
Fax: (828) 327-7009
E-mail: rogersmk@mrbizlaw.com

47

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO: 10-CV-00005

| | |
|---|---|
| TRIAD PACKAGING, INC. and LOUIS WETMORE, <br><br> Plaintiffs, <br><br> v. <br><br> SUPPLYONE, INC., <br><br> Defendant <br><br> v. <br><br> DURHAM BOX COMPANY, <br><br> Third Party Defendant. | ***CERTIFICATE OF SERVICE*** |

I hereby certify that on February 9, 2011, I electronically filed the foregoing Memorandum of Law Opposing Defendant's Motion For Summary Judgment for the above referenced case with the Clerk of court using the CM/ECF system which will send notification of such filing to the following:

jkingston@thompsoncoburn.com          sallred@mcguirewoods.com

mkinghorn@mcguirewoods.com          tdouglass@thompsoncoburn.com

This the 9th day of February, 2011.

By: /s/Matthew K. Rogers

Matthew K. Rogers
NC State Bar No.: 26992
Attorney for Plaintiff

OF COUNSEL:
LAW OFFICES OF MATTHEW K. ROGERS, PLLC
200 First Avenue, NW, Suite 104
PO Box 9096
Hickory, NC 28603
Telephone: (828) 327-2005
Fax: (828) 327-7009
E-mail: rogersmk@mrbizlaw.com