**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO. 5:10CV5-RLV**

| | | |
|---|---|---|
| **TRIAD PACKAGING, INC., and** | ) | |
| **LOUIS S. WETMORE,** | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | <u>**Memorandum and Order**</u> |
| | ) | |
| **SUPPLYONE, INC.,** | ) | |
| Defendant / Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DURHAM BOX COMPANY,** | ) | |
| Third-Party Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the following motions: 1) SUPPLYONE's Motion for Judgment on the Pleadings as to Plaintiffs' First Claim for Relief (Quasi-Contract Claim) (Doc. 20); 2) SUPPLYONE's Motion for Summary Judgment as to Plaintiffs' Third (Fraud) and Fourth (Unfair and Deceptive Trade Practices) Claims for Relief (Doc. 26); 3) SUPPLYONE's Motion for Summary Judgment on Plaintiffs' Second Claim (Breach of Contract) (Doc. 62); 4) SUPPLYONE's Motion for Partial Summary Judgment on its own Breach of Contract Counterclaim (Doc. 63); 5) TRIAD PACKAGING'S, LOUIS WETMORE's, and DURHAM BOX COMPANY's Joint Motion for Summary Judgment as to Plaintiffs' Claims (Docs. 65, 70)[1]; and 6) TRIAD PACKAGING'S, LOUIS WETMORE's, and DURHAM BOX

---

[1]  For purposes of clarification, although reflected as two different motions and docket entries, the second docket entry (Doc. 70) simply reflects that the original filing (Doc. 65) was filed on behalf of Third-Party Defendant DURHAM BOX COMPANY and Plaintiff LOUIS WETMORE in addition to TRIAD PACKAGING.  (*See* Text of May 4, 2011 docket entry by deputy clerk indicating that the Notice

COMPANY's Joint Motion for Summary Judgment as to Defendant's Counterclaims (Doc. 61).

## I. Nature of the Case

This case arises out of a dispute concerning an Asset Purchase Agreement ("APA") entered into by Triad Packaging, Inc. ("TPI"), Durham Box Company ("DBC"), d/b/a as Merit Container ("Merit"), the Sellers, and SupplyONE Holdings Company, Inc. ("SupplyOne"), the Buyer. (Exh. A) The APA was executed on October 8, 2008, with individual Plaintiff Louis S. Wetmore ("Wetmore") representing TPI and DBC and Chief Financial Officer Jack H. Keeney ("Keeney") representing SupplyOne.

TPI, a North Carolina corporation, was previously engaged in the manufacturing and sale of corrugated boxes within the packaging industry. (Compl., ¶ 4). DBC (or "Merit") was also a North Carolina corporation with its principal place of business in South Carolina. (Answer & Counterclaim, ¶ 163). DBC was engaged in the business of reselling corrugated shipping containers, displays, and related packing products. (Answer & Counterclaim, ¶ 163; Pls.' Mem. In Opp'n, at 5). Wetmore was the President and the majority shareholder of both TPI and DBI.[2] (Compl., ¶ 11; Answer & Counterclaim, ¶ 164).

---

of Electronic Filing was reissued for this reason.)

[2] While the entities were related, both TPI and DBC had their own established customer bases and sales staffs. (Pls.' Mem. In Opp'n, at 5). According to Wetmore, TPI had a relatively steady customer base of approximately 200 accounts during the period from January 2000 through October 2008. (Wetmore Dep., 16). Almost every order run by TPI required TPI to produce according to customer specifications. (Wetmore Dep., 15) In addition to serving its North Carolina clientele, TPI manufactured and sold product to DBC / Merit. (Id.) DBC stocked product from TPI and sold to customers in South Carolina. (Id.).

SupplyOne, a Delaware corporation, was also (and still is) in the packaging industry dealing in corrugated boxes. (Compl., ¶ 6). As part of its business strategy, SupplyOne sought to acquire and consolidate smaller regional packaging businesses "who are recognized leaders in their market areas with excellent customer relationships." (Compl., ¶¶ 12-13; Answer, ¶¶ 12-13).

In November of 2007, Wetmore entered into discussions with SupplyOne personnel about the possibility of SupplyOne acquiring all of the assets of both TPI and DBC.[3] Negotiations commenced in December 2007. (Wetmore Aff., ¶ 2). Altogether, the negotiations and "due diligence" process took approximately ten (10) months.

The first phase of due diligence occurred from November 2007 through early April 2008. SupplyOne dedicated the time and energy of William M. Laughlin, Senior Vice President of Corporate Development ("Laughlin"), and John Caruso, Vice President of Financial Operations ("Caruso"), to this acquisition. (Pls.' Mem. In Opp'n, at 6). SupplyOne's "standard procedure" contemplated that Laughlin would handle all the negotiations with the seller and then transition primary responsibility to Caruso to schedule and coordinate the due diligence.[4] (Caruso Dep.,

---

[3] It is advantageous in the packaging industry to possess the capability to produce and stock goods regionally in order to meet the needs of customers on a timely basis and to avoid cost-prohibitive freight charges. (Leith Dep., at 15-17).

[4] According to SupplyOne, its acquisition process generally involves the following steps: 1) Identification of acquisition target; 2) Laughlin negotiates and requests documents to begin preparation of "highlights and hurdles," which may be prepared by either Laughlin or Caruso; 3) Senior management is approached and interest in the acquisition is gauged; 4) Tentative approval from the Board of Directors ("Board") is obtained; 5) Letter of intent is prepared by Laughlin; 6) Laughlin introduces Caruso to owner of acquisition company and transitions associated primary responsibilities to Caruso; 7) Caruso undertakes documentary due diligence by requesting more detailed financial information and reviewing upon receipt; 8) Caruso undertakes on-site due diligence; 9) Preliminary reports from various managers and vice presidents in each area are gathered and provided to Caruso; 10) Caruso and Laughlin meet to determine if due diligence materials present any issues and, if so, seller is contacted; 11) Final Board package is prepared and submitted to SupplyOne's President; 12) Final Board package is submitted to the

101; Laughlin Dep., 72). Consequently, the dealings between the parties were handled primarily between Wetmore and Laughlin.

The first step taken to facilitate the acquisition involved financial disclosure. On November 27, 2007, Wetmore provided Laughlin with financial information for TBI and DBC. (Pls.'s Exh. 11). Typically, the initial financial disclosure included "financial statements for the last three years plus the most recent trailing 12-month period." (Caruso Dep., 103, 225-226).

On November 29, 2007, Laughlin forwarded a memorandum and accompanying financial analysis to SupplyOne's Chief Executive Officer, Bill Leith ("Leith"), and Keeney. (Pls.' Exh. 11). Laughlin recognized that "in all likelihood, the receivables are not 100% collectible" and that SupplyOne would "have to make an additional working capital investment to carry accounts receivable." (Pls.' Exh. 11 at 7). Laughlin was aware that Wetmore had significant "hard liabilities" such that Wetmore may only "break even" on a sale. (Pls.' Exh. 11 at 7). Despite these observations, Laughlin proposed the purchase of TPI and DBC as a "bolt on" acquisition to SupplyOne's existing North Carolina operations located in Rockwell, North Carolina.[5] (Pls.' Mem. In Opp'n, at 7 / Exh. 11 at 6). In other words, Laughlin suggested that the most attractive option for acquisition would call for shutting down TPI's Conover, North Carolina plant completely, shifting production to Rockwell, and retaining the South Carolina facility

---

Board for final approval. (Caruso Dep., 102-107). Laughlin does not recall explaining the entire SupplyOne procedure for acquisition to Wetmore, including the possibility that additional negotiations would occur following due diligence. (Laughlin Dep., 145-46).

5 The phrase "bolt on" apparently refers to an acquisition with the potential to accomplish "the elimination of substantial redundant manufacturing, distribution, and administrative costs." (Pls.' Exh. 11 at 6). In light of the suggested "bolt on" approach, SupplyOne's Rockwell Officers took part in evaluating the purchase of TPI and DBC, sharing their plans with Laughlin and Keeney as early as March 2008. (Pls.' Exh. 11, at 8; Exh. 13).

[DBC/Merit] as a distribution center. (Pls.' Exh. 11 at 6). Laughlin expressly noted that SupplyOne "would have to share the benefit of some of [its] synergies [savings due to efficiencies associated with the "bolt on" acquisition] to get to the point where the owner would not have to declare bankruptcy." (Pls.' Exh. 11 at 7).

On April 13, 2008, Wetmore disclosed to Laughlin that he was considering a competing offer to purchase TPI. (Pls.' Exh. 12 / Wetmore Aff., ¶¶ 4-7). According to Wetmore, Plaintiffs received an offer to purchase from Container Supply Corporation ("CSC"). (Doc. 71 / Pls.' Mem. In Supp., at 6.). Wetmore estimated the total value of the proposed CSC deal to be in excess of $3.7 million. (Wetmore Aff., ¶ 6). Wetmore conveyed to Laughlin that "certainty of closing and up-front money were two important factors" in his decision to sell. (Wetmore Aff., ¶ 7).

According to Plaintiffs, on April 14, 2008, the next day, SupplyOne made a verbal offer, including price, to purchase all of the assets of TPI and DBC from Wetmore. (Wetmore Aff., ¶ 7). Laughlin emailed SupplyOne's CEO Leith on April 14th reporting, "[W]e have a deal." (Pls.' Exh. 14). Laughlin also represented that once the formal Letter of Intent was in place, there would not be any "significant further negotiations." (Id.) Although Wetmore understood that the parties' agreement was subject to due diligence, in Wetmore's opinion, all material terms were discussed and agreed upon as of April 14, 2008. (Wetmore Aff., ¶ 8). Upon being advised by Laughlin that a deal had been struck, Wetmore discontinued discussions with CSC in favor of the SupplyOne deal. (Wetmore Aff., ¶ 12).

On April 17, 2008, Laughlin circulated a number of documents for consideration by the SupplyOne Board of Directors ("Board") as well as Leith and Keeney. (Pls.' Exh. 15; Caruso Dep., 59). The packet included a "strategic fit memorandum," "draft Letter of Intent,"

"highlights and hurdles for the transaction," and a recommended proposal for acquisition upon which the Board would cast their vote either in favor of or against. (Pls.' Exh. 15; Caruso Dep., 56-57, 59-60). Ordinarily, acquisition materials were presented during an actual board meeting in hard copy.[6] (Caruso Dep., 56-57). In this instance, however, the packet was forwarded via group email. Laughlin explained:

> "I am sending all of this to you at one time, because Lou Wetmore has another offer on the table for his company."

(Exh. 15).

It was Caruso's responsibility to present the TPI / DBC acquisition to the SupplyOne Board. (Caruso Dep., 52). However, Caruso could not recall when the Board first met to discuss the TPI / DBC acquisition or whether the Board met more than once to discuss it. (Caruso Dep., 52,54-56). The record reveals that on April 18, 2008, email correspondence was exchanged between certain SupplyOne Board members, including Ryan Northington ("Northington") and Noel Strauss ("Strauss"), requesting additional information about the acquisition.[7] (Caruso Dep.,

---

[6] Caruso testified that, "[o]rdinarily, the board books prepared for discussion in the board meetings are normally done in hard copy and sent out a week in advance." (Caruso Dep., 51). In the case of an acquisition proposal, the Board typically receives a complete binder detailing the various aspects of due diligence, including a letter of recommendation. More specifically, the binder includes a "strategic fit" or recommendation prepared by Caruso, a description of the potential sources of funding for acquisition and likely uses, and due diligence reports from the respective vice presidents and managers (*i.e.*, financial due diligence, human resource due diligence, an appraisal of the equipment, an environmental study, normally Phase 1, IT due diligence, and operational due diligence.). (Caruso Dep., 56-57). Presentation of these materials typically calls for an up or down vote by the Board. (Caruso Dep., 57). Once the Board gives its vote of approval, it is left to the management team to determine whether to proceed with closing or not. (Caruso Dep., 67). In other words, once the vote is taken, the Board may be updated as to any change but a second vote is not required. (Caruso Dep., 57).

[7] SupplyOne is owned – at least in part - by Stephens Capital. (Caruso Dep., 42-46). Noel Strauss is a (or "the") Partner of Stephens Capital. (Caruso Dep., 42). Strauss represents Stephens Capital and is a member of the Board of Directors for SupplyOne. (Caruso Dep., 45, 48-50).

57-60 / Rule 30(b) Dep. Exh. 4). Caruso surmised from reviewing the email chain that Strauss would have reviewed the acquisition packet in advance of SupplyOne's first quarterly board meeting of the year. (Caruso Dep., 61-62). Caruso confirmed that Strauss "obviously liked the deal." (Caruso Dep., 62-63).

While the parties disagree as to significance, SupplyOne's first formal review of the proposed acquisition by its Board was positive. Nonetheless, the Board requested additional information, which was not atypical. (Caruso Dep., 57). Apparently, the Board was concerned with the fact that TPI was experiencing cash flow problems. (Caruso Dep., 63). In addition, it was suggested that the accounts payable may require reclassification and need to be reflected as part of the purchase price.[8] (Caruso Dep., 59-60). At the same time, Caruso confirmed that the acqustion price "was already set." (Caruso Dep., 60).

The parties' intentions were first reduced to writing in a seven (7) page Letter of Intent ("LOI") dated April 29, 2008. (Exh. B). On the first page, the LOI confirms that "[t]he purchase price will be $3,500,000. . . ." (LOI, at 1). The LOI, authored by Laughlin, was expressly deemed not binding, with the exception of the agreements as to "Confidentiality," "Non-solicitation," and Professional Fees," as to which each party intended to be legally bound. (LOI, at 6). The LOI made clear that the current proposal reflected the "present mutual intentions" but did "not contain all matters upon which agreements must be reached in order for the transaction

---

[8] Caruso explains that SupplyOne utilizes a normal DPO of 30 days. (Caruso Dep., 63). "DPO" means "days purchases outstanding," which means that SupplyOne pays its bills in 30 days. (Id.) Caruso further explains that in acquisitions, when a company it seeks to acquire is not paying its vendors on a thirty-day cycle, SupplyOne, as the purchaser company, prepares itself to bring any overdue accounts current immediately following closing. (Id., 63-64). Thus, SupplyOne considers this an additional expense associated with the purchase price. (Id.) In fact, it seems that these concerns were addressed by Laughlin in a revised model proposed to the Board prior to execution of the Letter of Intent. (Doc. 71 / Exh. 21).

to be completed." (Id., at 6).  The LOI was to "serve as a guide to the negotiation and preparation

of the definitive agreement" and could "be terminated by either party with or without cause and

without liability, by providing written notice to the other party." (Id., at 6-7).

The LOI addressed the parties' conduct and expectations during the due diligence period

including the kind of information SupplyOne would need to perform due diligence.  (LOI, at 4-

5).   SupplyOne specifically indicated its wish "to contact some customers and suppliers" as a

part of due diligence, subject to the approval of TPI's and DBC's shareholders.  (LOI, at 5).   It

was agreed that TPI and DBC would "continue to operate in the ordinary course of business,

consistent with past practices."   (LOI, at 5).

In the Non-solicitation clause, the LOI provided that Plaintiffs would  not "undertake or

continue acquisition discussions" with any other party,  "solicit, or engage others to solicit, offers

for the purchase of all or any substantial part of the assets" or "for any merger or consolidation,"

or negotiate with or enter into any agreements or understandings during the pendency of the due

diligence period  –  "a period from the date of this letter until the earlier of the date on which this

letter terminates and July 31, 2008." (LOI, at 5-6).  If the definitive agreement was not in place

by July 31, 2008, the "Non-Solicitation" provision would expire. (LOI, at 6).   It appears that the

LOI contemplated a July 31, 2008 target date for closing.  (Wetmore Aff., ¶ 12).

"Other Conditions" to the closing included: 1) "appropriate corporate approvals" by

SupplyOne; 2) that consummation of the transaction had to be for both TPI and DBC; 3) prior to

closing, TPI and DBC had to be relieved of any obligations under the Pinnacle requirements

supply agreement, or the Pinnacle owners would have to agree to reduce the requirements supply

agreement[9]; and 4) an acknowledgment by the shareholders[10] that the proposed purchase price had been based on information concerning historical performance provided to SupplyOne by TPI and DBC. (LOI, at 5). Under the LOI, SupplyOne's pre-closing obligations were 1) to draft the "definitive asset purchase agreement"; and 2) to obtain "appropriate corporate approvals."

The second phase of due diligence took place from April 2008 until the closing October 8, 2008. Upon request, Wetmore provided additional due diligence materials to SupplyOne in the third week of May 2008. (Wetmore Aff., ¶ 13). Soon after Wetmore provided the additional materials, in May and June of 2008, the Pinnacle supply agreement became the subject of debate. (Doc. 72 / Pls.' Exh. 1) Laughlin asked Wetmore to either give SupplyOne an indemnity for due diligence costs (in the event the Pinnacle matter could not be resolved) or to agree to delay the closing. (Wetmore Aff., ¶ 16). Wetmore eventually provided SupplyOne with an indemnification as requested in hopes that the acquisition could still be accomplished by the end of July 2008. (Wetmore Aff., ¶ 16).

The LOI was originally set to expire on July 31, 2008, but was modified on June 24, 2008 to apply through September 15, 2008. On June 24, 2008, Laughlin wrote Wetmore indicating that "all July 31, 2008 dates included in the referenced Letter of Intent are hereby changed to September 15, 2008." (Doc. 72 / Pls.' Exh. 8). The letter also documents Wetmore's agreement

---

[9]  TPI and Pinnacle had a supply agreement that obligated TPI to buy most of its corrugated sheet requirements from Pinnacle. TPI's Pinnacle supply agreement, or Wetmore's ability to adequately resolve it, ultimately became a sticking point and contributed to some of the delay because SupplyOne was not willing to honor the agreement TPI had with Pinnacle. (Laughlin Dep., 70-71). SupplyOne thought it could save money by replacing Pinnacle as a supplier with another vendor. (Laughlin Dep., 154-56). At SupplyOne's request, under the LOI, Pinnacle was to reduce its requirements supply agreement to 8 mmsf/month − the lowest pricing that SupplyOne pays to any of its other suppliers.

[10]  Wetmore was the sole shareholder for TPI and the majority shareholder for DBC or Merit. However, DBC had at least one other shareholder, Gregory Bailes. (Pls.' Mem. In Opp'n, at 5).

to indemnify SupplyOne up to $75,000 for due diligence costs should he decide not to close the transaction contemplated in the LOI, "so long as SupplyOne has not otherwise changed the letter of intent terms." (Id.)  The June 24, 2008 letter required Wetmore's signature indicating his agreement to the "modifications to the referenced letter of intent."  (Id.)

Following postponement of the Closing, between July and October 2008, various TPI and DPC customers expressed concern over the proposed purchase by SupplyOne. Wetmore explained that one of the uncertainties associated with the acquisition was the fear that SupplyOne may decide to discontinue some of the TPI or DBC business, leaving the customers in the unfavorable position of attempting to find replacement product on short notice.[11] (Wetmore Dep., 48, 50-51).  Wetmore further explained that TPI's customers "didn't know who SupplyOne was or what their operating philosophies were, and it has occurred in [the] business that when one business is acquired by another, certain customers don't meet the profile that is desired by the purchasing company and so they discontinue doing business with them." (Wetmore Dep., 47-48).

Unbeknownst to Wetmore, SupplyOne management personnel had become concerned that the savings and efficiencies first identified by Laughlin might not be captured.[12]  On July 2, 2008, before the on-site due diligence had even begun, Caruso emailed Laughlin and Keeney to

---

[11]  Wetmore identified the following customers as having expressed concern: Ethan Allen, Thomasville Furniture, Canac Cabinets, Lowe's Klingspore Abrasives,  Hickory Hill Furniture, Multi-Wall Packaging, Multi-Wall Packaging Idea, North American Rescue, Stork Prints America, Technibilt, Collezione Europa, Bernhardt Furniture, Dispozo Plastics, Mergon, Prince, and several Siemens divisions companies.  (Wetmore Dep., 48, 50-51).

[12]  According to Wetmore, the delay in closing was being explained to him as necessary due to a schedule conflict.  (Wetmore Aff., ¶ 22).

express his concerns with the acquisition. (Doc. 72 / Pls.' Exh. 10). Caruso went so far as to volunteer that "if [he] had to contribute a percentage of the purchase price, [he] would decline to participate." (Id.) In addition, internal correspondence indicates that SupplyOne had determined shortly after on-site due diligence was undertaken that its original plan to close down the TPI Conover facility was not feasible. In an email from Keeney dated August 12, 2008, reports were summarized opining that *after the first week of due diligence* (on-site due diligence), "leaving the Conover plant open makes more sense than merging it into Rockwell." (Doc. 41 / Pls.' Exh. 34 at 3). Keeney noted, "[t]his approach would be a departure from the plan originally contemplated, will provide less than the projected earnings and may be impractical . . . ." (Id.) Laughlin responded the same day: "Based on all you have indicated, it does not look like the returns will be there. . . . [I]'m not sure of the benefits of having two manufacturing locations within an hour of each other." (Doc. 41 / Pls.' Exh. 34 at 2). Laughlin subsequently noted his belief that Wetmore would be flexible given that SupplyOne was Wetmore's "only opportunity to sell his company for cash." (Id.)

In early August 2008, Leith, SupplyOne's President and CEO, visited TPI's Conover facility and presented talking points to Wetmore as well as TPI's employees. (Wetmore Aff., ¶ 27 / Exh. B). Later in the month, Wetmore learned that Canac Cabinet, a large customer of TPI, was going to close its business. (Wetmore Aff., ¶ 25). Wetmore notified SupplyOne about the loss of the Canac Cabinet account but no changes to the deal were suggested at that time. (Wetmore Aff., ¶ 25).

On or around September 4, 2008, Laughlin advised Wetmore that the price agreed upon earlier could no longer be justified and that they would need to agree on new terms to proceed. (Wetmore Aff., ¶¶ 29-31). According to Wetmore, Laughlin reasoned that TPI's loss of the

Canac Cabinet account was a factor as well as the trend indicating that sales were declining. (Wetmore Aff., ¶ 30). In fact, between April and September 2008, in addition to losing the Canac Cabinet account, TPI lost its GE Security and Hafele America accounts and DBC/Merit lost the Mergon Corporation account.[13] (Wetmore Dep., 69).

The parties eventually settled upon a lower purchase price of approximately $3 million dollars. However, Wetmore balks at SupplyOne's suggestion that the revision in price was "negotiated." (Wetmore Aff., ¶¶ 32, 33). In other words, SupplyOne's withdrawal of the more favorable offer so late in the process essentially left no choice but to accept. (Wetmore Dep. 62-63). Wetmore represents that by the time Laughlin proposed the lower purchase price in September 2008, Plaintiffs had announced the sale to SupplyOne, SupplyOne had visited Plaintiffs' customers, and Plaintiffs were beginning to lose customers and employees. (Wetmore Dep., 63). In addition to the proposed change in price, Laughlin told Wetmore that "the net assets would be reduced proportionately." (Wetmore Aff., ¶ 31).

On September 12, 2008, nearly five months after the LOI was signed, SupplyOne provided Plaintiffs with a proposed draft APA. Wetmore claims he was "shocked" by the document and the "many new terms and issues that [he] never discussed with Bill Laughlin." (Wetmore Aff., ¶ 37). The forty-two (42) page APA provided that SupplyOne would purchase the assets of TPI and DBC from Wetmore for $3,094,350.52 subject to certain post-closing adjustments to price for the "Minimum Net Current Asset Amount" and "Unsold Inventory /

---

[13] TPI had also recently lost its Ethan Allen account. Wetmore contends that he notified SupplyOne about the loss of the Ethan Allen box business *before* striking any deal and before the LOI was signed. (2nd Wetmore Aff., ¶ 29).

Uncollected A/R."[14]  (APA, Section 2.7(a)).  If necessary, the post-closing adjustments to price were to be addressed within 180 days of the closing.

SupplyOne required Plaintiffs to provide warranties concerning the Accounts Receivable ("A/R") and Inventory.  With respect to A/R, the APA explicitly recognized that A/R "are bona fide Accounts Receivable created in the ordinary course of business and are good and collectible . . . ." (APA, Section 4.13).  Similarly, regarding Inventory, the APA provided that "inventory consists of items of good, usable and merchantable quality in all material respects and does not involve obsolete or discontinued items."  (APA, Section 4.14).  The APA required SupplyOne to use its "best efforts" to fulfill its contractual obligations. (APA, Section 6.10).

After numerous delays, the closing occurred on October 8, 2008.

At the 180-day mark, in April 2008, a dispute arose concerning an alleged shortfall between the agreed-upon minimum asset value and the value of assets actually delivered, including uncollected  A/R.  On May 20, 2009, SupplyOne corresponded with Wetmore to report that much of the purchased Inventory was obsolete and certain Accounts Receivable were uncollectible.[15]  SupplyOne requested payment from Plaintiffs in the amount of $500,000 and Wetmore refused.  As a result, SupplyOne elected to invoke Section 10 of the APA and offset its

---

[14]  SupplyOne's payment arrangement under the APA, which was rather complex, was to be via promissory notes, escrow funds, and a closing cash payment as well as payment of non-trade debt.  The APA called for  a portion of SupplyOne's payment at closing to be directed to pay down non-trade debt belonging to TPI and DBC.  (APA, Section 2.6(b)).  Further, a portion of the purchase price was to be paid by SupplyOne (i)  in the form of convertible subordinated unsecured promissory notes ($100,000 in principal); (ii) $175,000 in cash was to be paid to the escrow agent consistent with an escrow agreement; and (iii) the remainder of the purchase price after subtracting (i), (ii), and non-trade debt payoffs, was to be wired to the Plaintiffs no later than three (3) business days prior to closing.  (APA, Sections 2.6(a) and (b)).

[15] As of May 2009, SupplyOne sought to reassign approximately $56, 933.69  in A/R to Wetmore and approximately $75,000 in Inventory.  (Doc. 72 / Exh. 17).

own financial obligations under the APA by the same amount.[16]

On or about December 21, 2009, SupplyOne submitted its Claim Notice to the Escrow Agent pursuant to the procedure outlined in the APA.[17]   (APA, Sections 12.5, 10). Plaintiffs objected.   In light of SupplyOne's Claim, the escrowed purchase money in the amount of $175,000 and the $100,000 bond that was to be a part of the purchase price (i.e., approximately $275,000 plus interest), was never paid to Wetmore.  (Wetmore Dep., 32-34).

On December 28, 2009, TPI and Wetmore commenced litigation in the North Carolina General Court of Justice, Catawba County Superior Court, bringing claims against SupplyOne for unjust enrichment, breach of contract, fraud, and unfair and deceptive trade practices, N.C. GEN. STAT. § 75-1.1.  (*See Triad Packaging, Inc. and Louis Wetmore v. SupplyONE, Inc.*, Case No. 09 CVS 4872).   The record does not make clear why DBC was not named as a plaintiff along with TPI and Wetmore.

SupplyOne was served on or about December 31, 2009, and  filed a timely Notice of Removal on January 28, 2010, pursuant to 28 U.S.C. §  1446(b).  (Doc. 1)  SupplyOne answered

---

[16]  Section 10 controls Indemnification and the requisite procedure for seeking indemnification by the other party under the APA.  Under Section 10, there must be a Claim Notice, a Claim Response, a $50,000 Threshold Amount for damages sought, and provision for offset for any amounts owed to the Buyer "directly from the Seller Parties under the Notes, and / or from the Escrow Funds pursuant to the Escrow Agreement."  (APA, Section 10.3(b)).

[17]  Section 12.5 of the APA, entitled " Remedies," reads:

The remedies provided by in Section 10 shall constitute the ***exclusive remedies*** for the matters covered thereby.  With respect to any matters not covered by Section 10, any party shall be entitled to such rights and remedies as such party may have at law or in equity or otherwise for any breach of this Agreement, including the right to seek specific performance, rescission or restitution, none of which rights or remedies shall be affected or diminished by the remedies provided hereunder.

(APA, Section 12.5 at 39).

the Complaint and responded with Counterclaims against TPI alleging breach of contract and breach of warranty and the same claims against DBC (also denominated by SupplyOne as Counterclaims). Although SupplyOne did not file a separate document identified as a Third-Party Complaint to name DBC as a third-party defendant, the Court construes SupplyOne's "Answer & Counterclaims" as a Third-Party Complaint as well.[18] *See* FED. R. CIV. P. 14(a)(1) and (2); *see also Baker v. Sisk*, 1 F.R.D. 232, 236 (E.D.Oklahoma December 17, 1938) (construing motion to dismiss as an answer and explaining that treatment of a pleading is to be determined by its nature rather than the designation given it by a party). Unless the facts or legal argument pertain solely to Third-Party Defendant DBC, the Court will refer to TPI, DBC, and Wetmore collectively as Plaintiffs.

This Court has original jurisdiction over this action under 28 U.S.C. § 1332 based upon diversity of citizenship.[19] The requirements of the removal statute, 28 U.S.C. § 1441(a), are likewise satisfied.

The parties have submitted an array of motions which are ripe for disposition by the Court.

---

[18] It appears that the criteria for including DBC as a Third-Party Defendant is satisfied given that DBC may be liable to SupplyOne for all or part of the Plaintiffs' claims against SupplyOne. FED. R. CIV. P. 14(a)(1) and (2). Moreover, under Rule 19(a)(1), DBC is likely a necessary party and has surely waived any objection to being named a Third-Party Defendant. FED. R. CIV. P. 19(a)(1).

[19] Plaintiffs Triad Packaging and Wetmore are both considered North Carolina citizens while Defendant SupplyOne is a Delaware citizen with its principal place of business in Pennsylvania. *See* 28 U.S.C. § 1332(c); (Compl., ¶¶1-3). Plaintiffs' Complaint also alleges that the amount in controversy exceeds $75,000, exclusive of interest and costs. (Compl., at 12.) SupplyOne's Third-Party Complaint likewise did not defeat diversity jurisdiction since DBC / Merit is also a North Carolina citizen. *See Central West Virginia Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 107 (4th Cir. 2011) ("In sum, the touchstone now for determining a corporation's principal place of business for diversity purposes is 'the place where the corporation's high level officers direct, control, and coordinate the corporation's activities.'")(internal citation omitted).

## II.  Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010).   In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1);  *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

In this case, the parties have filed cross-motions for summary judgment and / or partial summary judgment. Thus, this Court must review each motion separately on its own merits. *See Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003) (internal citation omitted); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (internal citations omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Rossignol,* 316 F.3d at 523 (internal citation omitted).

## III.  Governing Law

Section 12.7 of the APA provides that "[t]his Agreement shall be construed and interpreted in accordance with the Laws of the State of Delaware, without regard to its provisions concerning conflict of laws."  (APA, Section 12.7 at 40).  However, the parties' filings analyze the breach of contract issues under North Carolina law without any mention of § 12.7.

As a general rule, "North Carolina will give effect to a contractual provision agreeing to a different jurisdiction's substantive law." *Covenant Equip. Corp. v. Forklift Pro, Inc.*, 2008 WL 1945973, * 8 (2008 NCBC 10) (N.C.Super.Ct. May 1, 2008) (citing *Tanglewood Land Co. v. Byrd*, 261 S.E.2d 655, 656 (N.C.1980)) (absent agreement by the parties to apply another jurisdiction's substantive law, "the interpretation of a contract is governed by the law of the place where the contract is made"). "However, North Carolina will not give effect to a choice of law provision if the "law of the chosen state would be contrary to a fundamental policy" of North Carolina." *Covenant Equip. Corp.,* 2008 WL 1945973, *8 (quoting *Cable Tel. Servs., Inc. v. Overland Contr'g, Inc.*, 574 S.E.2d 31, 33-34 (N.C.App.2002)). As explained by the North Carolina Court of Appeals:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of a particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of applicable law in the absence of an effective choice of law by the parties.

*Cable Tel. Servs., Inc.*, 574 S.E.2d 31, 33-34 (N.C.App.2002).

Despite the APA's choice of law provision, the parties recite and rely on North Carolina law.[20] Here, the acquisition involved the purchase of two corporate entities organized in

---

[20] SupplyOne applies North Carolina law in its Memorandum in Support of Summary Judgment on Plaintiffs' Breach of Contract claim. In its discussion concerning the interpretation of Section 2.7(a) of the APA (i.e., plain meaning of contract language), SupplyOne begins with the phrase, "as North Carolina law requires." (Doc. 64 / Def.'s Combined Mem. In Supp. SJ and PSJ, at 5). Likewise, the remainder of its memorandum relies on North Carolina law. (Doc. 64). Plaintiffs also cite North Carolina law, including the North Carolina's version of the Uniform Commercial Code, N.C. Gen. Stat. § 25-2-314, the Implied Warranty of Merchantability.

accordance with North Carolina law. Furthermore, Wetmore testified that most of the negotiations between him and Laughlin occurred within North Carolina. (Wetmore Dep., 45). Finally, while the record does not expressly include a representation that the APA was finally executed or made in North Carolina, Section 3 of the APA and correspondence between the parties prior to October 8, 2008, contemplate that the closing would be held in North Carolina "at the offices of counsel to the Seller Parties [Plaintiffs]." (APA, Section 3 / Pls.' Exh. 24 at 4, ¶ 4). For these reasons, the Court determines that the substantive law of North Carolina is properly applied.

## IV. SUPPLYONE's Motions

For purposes of SupplyOne's motions, the facts and inferences are viewed in the light most favorable to Plaintiffs. *Rossignol,* 316 F.3d at 523.

### A. Plaintiffs' First Claim For Relief – Unjust Enrichment & Detrimental Reliance

Plaintiffs' first claim is premised upon equitable or quasi-contract principles.[21] In *Booe v. Shadrick*, the North Carolina Supreme Court stated:

> The Restatement of Restitution § 1 lays down the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously . . . . The benefit must not be gratuitous and it must be measurable. . . . [T]he defendant must have consciously accepted the benefit. A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law. A quasi contract or a contract implied in law is not a contract. The claim is not based on a promise but is imposed by law to prevent an unjust enrichment. ***If there is a contract between***

---

[21] Early in the litigation SupplyOne moved for judgment on the pleadings as to Plaintiffs' claims premised upon equitable or quasi-contract principles pursuant to Fed. R. Civ. P. 12(c). Because the Court now has a complete record before it, and all of the legal issues have been exhaustively briefed, this claim is considered under Rule 56 along with the other claims and counterclaims.

> ***the parties the contract governs the claim and the law will not imply a contract*** .
> . . .

*Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988) (internal citations omitted) (emphasis added).

In seeking dismissal, SupplyOne contends that a quasi-contract claim is only cognizable where no express contract exists that speaks to the same subject matter. That a contract implied by law cannot be asserted where an express contract exists is horn book or blackletter law. *See Whitfield v. Gilchrist*, 497 S.E.2d 412, 415 (N.C. 1998); *Hall v. Mabe*, 335 S.E.2d 427, 429 (N.C.App. 1985) ("an express contract and an agreement implied by law cannot co-exist"; implied contract does not bar unjust enrichment claim). While, the existence of an express contract will not always bar a claim for unjust enrichment, a successful unjust enrichment claim is more likely to be made out where one party seeks payment for services provided that resulted in some actual benefit to the other party. *See e.g., John D. Latimer & Assocs., Inc. v. Housing Authority of City of Durham*, 297 S.E.2d 779 (N.C.App.1982) (notwithstanding express contract conditioning plaintiff's compensation on third-party agency's approval of project, issue of implied contract and quantum meruit remedy properly submitted to jury, and motion for directed verdict properly denied, where plaintiff's architectural plans were used by defendant housing authority despite project not being approved). However, that is not the case here as no services were provided and no benefit accrued to SupplyOne pending execution of the APA.

According to SupplyOne, execution of the APA governs *all* aspects of the parties' obligations in connection with the acquisition. The APA, which contains an integration clause, purports to encompass the entirety of the parties' agreement:

"This Agreement, together with the other Transaction Documents,[22] sets forth the entire understanding of the parties hereto with respect to the Transactions and supersedes all prior agreements or understandings among the parties regarding those matters."

(APA, Section 12.2, Contents of Agreement). The LOI was not considered a "Transaction Document." (Id.) Consequently, if the integration clause is given effect, the APA supersedes the LOI and "all prior agreements or understandings." *Hagler v. Hagler*, 354 S.E.2d 228, 234 (N.C.1987) (quoting *Hartford Acc. & Indemnity Co. v. Hood*, 40 S.E.2d 198, 201 (N.C. 1946) ("It is a well-settled principle of legal construction that '[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean.'"); *Karski v. Brazilian Resources, Inc.*, 2009 WL 1255545, at *6 (W.D.N.C. May 4, 2009) (rejecting unjust enrichment claim related to a letter of intent where subsequent consulting and stock purchase agreements contained integration clauses and expressly superseded any other agreements related to the same subject matter).

Despite the APA's integration clause, Plaintiffs contend 1) that the APA's integration clause does not preclude litigation over *tortious conduct* arising prior to the date of the APA; and 2) that this claim for relief "arises out of Defendant['s]acts and omissions prior to the execution of a definitive agreement."[23] (Doc. 71 / Pls.' Mem. In Supp., at 1.) According to Wetmore,

---

[22] In addition to the APA, the "other Transaction Documents" refer to an Escrow Agreement, a Lease Agreement, Employment Agreements providing for Wetmore and others to become SupplyOne employees, a Convertible Unsecured Subordinated Promissory Note giving Wetmore an option to take an ownership interest in SupplyOne in the event of an IPO (Initial Public Offering), and Subordination Agreements related to that Note.

[23] Plaintiffs, who contend in their Third Claim for Relief that SupplyOne committed fraud in connection with this transaction, explain that the theories articulated within the First Claim for Relief "amount[] to affirmative defenses to the formation of the APA." (Pls.' Mem. In Opp'n, at 5, n. 1.) (citing Fifth and Ninth Affirmative Defenses alleging fraud and unconscionability respectively).

Plaintiffs relied on SupplyOne's earlier representations - including the $3.5 million purchase price and the July 31st closing - in deciding to forego the CSC opportunity. (Wetmore Aff., ¶¶ 7, 8, 10, 12). Under these facts, Plaintiffs contend that the Court should impose a contract in light of Plaintiffs' reliance on the LOI and the representations made by Laughlin.

Plaintiffs rely heavily on *TSC Research, LLC v. Bayer Chemicals Corp.*, which is not in a summary judgment posture and is distinguishable in any event. *See TSC Research, LLC v. Bayer Chemicals Corp.*, 552 F.Supp.2d 534 (M.D.N.C. 2008). *TSC Research* stands in part for the proposition that an *alternative* theory of quantum meruit does not have to be expressly described as "alternative" and *may* survive a motion to dismiss since the equitable claim of quasi-contract assumes that the contract claim will fail. *TSC Research, LLC,* 552 F.Supp.2d 534; *In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1337-38 (S.D.Fla. February 20, 2002). In *TSC Research*, plaintiff's allegations against defendant, which included breach of oral agreement and breach of letter of intent, were determined to give rise to a single breach of contract claim. Under those facts, the breach of contract allegation that depended upon the letter of intent withstood defendant's Rule 12(b)(6) motion, as did the alternative unjust enrichment claim.[24] In discussing the enforceability of the letter of intent, the controlling North Carolina law was recited:

> A contract does not exist where the parties merely negotiate with the anticipation that their agreement will ultimately be memorialized in a later document. *Parker v. Glosson*, 641 S.E.2d 735, 737 (N.C.App. 2007). Agreements

[24] Similarly, Plaintiffs also appear to contend that a jury could reasonably infer from the record that an enforceable agreement between the parties was formed, an implied contract independent of the APA, before the APA was ever provided to Wetmore, in which case Plaintiffs' quasi-contract claim would be rendered moot.

containing an unmet condition precedent are also unenforceable. *Id.* However, a contract to enter into a future contract may be enforced if it specifies all of the "material and essential terms." *Boyce v. McMahan*, 208 S.E.2d 692, 695 (N.C. 1974).

*TSC Research, LLC*, 552 F.Supp.2d at 539. The letter of intent in *TSC Research* was accompanied by a proposed licensing agreement subject only to "any necessary final approvals" and a good faith obligation to obtain approval. *TSC Research, LLC*, 552 F.Supp.2d at 539. Like SupplyOne, the defendant in *TSC Research* argued that the letter of intent, characterized as "an agreement to agree," was not an enforceable contract because it contained a condition precedent that prevented contract formation.[25] The *TSC Research* court rejected defendant's position and held instead that the letter of intent was essentially an executory contract under which the parties had begun to perform. *TSC Research, LLC*, 552 F.Supp.2d at 539 ("The letter of intent memorializes the parties' promise to act in good faith in order to obtain final approval and, in the meantime, to act as if the licensing agreement were finalized."). Prior to the alleged breach, the *TSC Research* defendant started making payments to plaintiff in accordance with the licensing agreement. *Id. TSC Research* is easily distinguishable because the proposed licensing agreement referenced in (and attached to) the letter of intent was never actually executed. Thus, the sole writing asserted as an express contract was the letter of intent; there was no subsequent writing with an integration clause to reconcile with plaintiff's claim. In this case, the parties eventually memorialized the terms of their final agreement in the APA and closed the deal.[26] Unless the

---

[25] "A condition precedent is an event which must occur before a contractual right arises, such as the right to immediate performance. Breach or non-occurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability." *Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *14 (quoting *In the Matter of the Foreclosure of Goforth Properties*, 432 S.E.2d 855, 859 (N.C.1993)).

[26] The nature of the TSC Research transaction is also distinguishable from these facts, which

APA is found to be invalid,  Plaintiffs' alternative quasi-contract theory must fail.   (Section "IV, C").  SupplyOne's motion as to Plaintiffs' First Claim for Relief is <u>granted</u>.

### B.  Plaintiff's Second Claim For Relief – Breach of Contract

In order to succeed on the Second Claim for Relief, Plaintiffs must demonstrate: "(1) existence of a valid contract, and (2) breach of the terms of that contract."   *Poor v. Hill*, 530 S.E.2d 838, 843 (2000) (internal citation omitted).   "The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms."  *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated*, 2003 WL 21017350, *6 (N.C.Super., April 28, 2003) (2003 NCBC 3)(citing *Snyder v. Freeman*, 266 S.E.2d 593, 602 (N.C.1980); *Cap Care Group, Inc. v. McDonald*, 561 S.E.2d 578, 582 (N.C.App. 2002)).  "The heart of a contract is the intention of the parties, which is ascertained by the subject matter of the contract, the language used, the purpose sought, and the situation of the parties at the time."  *Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *6 (quoting *Pike v. Wachovia Bank & Trust Co.*, 161 S.E.2d 453, 462 (N.C.1968)).

### 1.  The APA Governs  The Parties' Contractual Obligations

Applying the relevant factors, the Court finds, as a matter of law, that the LOI was never intended by the parties to be a final agreement.  Indeed, the LOI designated itself as "non-binding" and forecast preparation of the "definitive asset purchase agreement."  The situation required due diligence by SupplyOne and the purchase was subject to SupplyOne's satisfactory

---

contemplate a complex multi-million dollar asset acquisition requiring a comprehensive agreement and more cumbersome due diligence.  *See e.g., JDH Capital, LLC v. Flowers*, 2009 WL 649161 (N.C.Super.2009) (2009 NCBC 4) (letter of intent concerning joint venture for purposes of commercial real estate development determined to be unenforceable as a matter of law where letter was designated non-binding and contemplated execution of a more complete agreement) (internal citations omitted).

findings after due diligence was completed. While relatively thorough as to terms, the complex nature of the transaction dictated more than the LOI and this is borne out in the forty-two page APA. Finally, the LOI was capable of termination by either party at any time with or without cause, which tends to support SupplyOne's position that the LOI was intended to be preliminary even though it contemplated certain steps to be taken by each party in anticipation of a final culmination in a binding contract.

Moreover, the APA's integration clause squarely addresses the effect of prior agreements and understandings between the parties. "North Carolina recognizes that merger [or integration] clauses are valid contractual provisions and the courts consistently uphold their use." *Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*, 2003 WL 22872490, * (2003 NCBC 9) (N.C.Super.Dec. 3, 2003) (citing *Zinn v. Walker*, 361 S.E.2d 314, 318 (N.C.App.1987)). While the words of an integration or merger clause do not categorically determine whether a contract is fully integrated, "a rebuttable presumption [arises] that the writing represents the final agreement between the parties." *Zinn v. Walker*, 361 S.E.2d 314, 318 (1987).

In the context of a proposed asset purchase, the North Carolina Business Court ("Business Court") considered similar legal issues and held, as a matter of law, that the letter of intent agreed to by the parties was *not* an enforceable contract where it was "made expressly subject to a future agreement." *See Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated*, 2003 WL 21017350, ** 8-11 (internal citations omitted) (unpublished). *Durham Coca-Cola Bottling* considered the enforceability of a letter of intent (referred to as the "Durham Proposal") that was signed by all of the shareholders and directors of the company to be acquired and, on its face, did *not* require any third party approvals to consummate the sale. *Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *3. Significantly, the proposal contemplated a

future "definitive acquisition agreement." *Id.*, 2003 WL 21017350, *9. The court determined that, *even if the parties intended the proposal to be a final agreement*, the rule of law announced in *Boyce* governed, namely, that "[t]he acceptance of a proposal to make a future contract, the terms of which are to be subsequently fixed, is not binding." *Id.*, 2003 WL 21017350, *8 (citing *Boyce*, 206 S.E.2d 496). Focusing on the language contemplating a forthcoming final agreement, the court stated:

> Parties that wish to be bound only upon execution of a formal document agree to negotiation in that manner because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the Court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed are so " minor" or "technical" that the contract[letter of intent] was binding despite the parties' unwillingness to have it executed and delivered. For the Court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *9 (quoting *Knight v. Sharif*, 875 F.2d 516, 524 (5th Cir.1989) (use of term 'final definitive agreement' leads to conclusion that what came before was neither final nor definitive));[27] s*ee also JDH Capital, LLC v. Flowers*, 2009 WL 649161 (N.C.Super.2009) (following *Durham Coca-Cola Bottling* and rejecting claim that letter of intent became enforceable in combination with oral agreement and partial performance). Significantly, the court explained that "[p]arties often use language such as "if," "on condition that," "provided that," "in the event that," and "subject to" to make an event a condition . . . ." .

---

[27] *Durham Coca-Cola Bottling* also found support for its decision in the proposal's inclusion of a "no-shop clause" (akin to a non-solicitation clause). The court reasoned that the inclusion of such a clause gives rise to an inference that the letter of intent is not sufficient to bind the parties. *Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *9-10 ("A no-shop provision is inconsistent with a definitive agreement. This provision contemplates additional negotiations . . . .").

*Durham Coca-Cola Bottling Co.*, 2003 WL 21017350, *14 (quoting *In the Matter of the Foreclosure of Goforth Properties*, 432 S.E.2d 855, 859 (N.C.1993)).   In addition to being "subject to" due diligence, the LOI plainly states that the transaction is "subject to" corporate approval by SupplyOne and expressly provides that a more definitive acquisition agreement is forthcoming.

In challenging the validity of the APA, Plaintiffs assert that execution of the APA was induced by fraud.[28]  The APA's integration clause does not prohibit Plaintiffs from seeking to invalidate the APA as a result of fraud.  In *Godfrey v. Res-Care, Inc.,* the North Carolina Court of Appeals explained:

> [P]arol evidence may be admitted into evidence to prove that a written contract was procured by fraud because "the allegations of fraud challenge the validity of the contract itself, not the accuracy of its terms [.]" Where a contract or transaction is induced by misrepresentations, the fraud and the contract are " 'distinct and separable—that is, the representations are usually not regarded as merged in the contract.' "

.
*Godfrey v. Res-Care, Inc.,* 598 S.E.2d 396 (N.C.App.2004) (internal citations omitted).

Because Plaintiffs produce insufficient evidence of fraud, the Court finds, as a matter of law, that the APA governs the parties' contractual obligations.  (Section "IV, C").

### 2.  Plaintiffs' Allegations Of Breach

"It is a basic principle of contract law that a party who enters into an enforceable

---

[28] Plaintiffs also contend that the APA should not be enforced due to unconscionability. In order to show that the APA is unconscionable, Plaintiffs must produce evidence that "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, . . . and [that] the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206,210 (1981).

agreement is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement. Good faith and fair dealing are required of all parties to a contract; and each party to a contract has the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Southeast Brunswick Sanitary District v. City of Southport*, 708 S.E.2d 215, 2011 WL 340535, *9 (N.C.App. 2011) (quoting *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 253 S.E.2d 625, 627-28 (N.C.App.1979)). Of course, the implied covenant of good faith must be brought within the bounds of an enforceable contract – not as a substitute for an existing contract term or provision. *Southeast Brunswick Sanitary District*, 708 S.E.2d 215, 2011 WL 340535, *9 (allegation of negotiating in bad faith regarding a new or amended agreement deemed insufficient for breach of implied covenant of good faith and fair dealing claim because allegation did not pertain to existing contractual obligations). Certain of Plaintiffs' contentions may be appropriately analyzed as a breach of the implied covenant of good faith and fair dealing. SupplyOne's contractual obligation to conduct itself reasonably and in good faith <u>under the APA</u> is for the fact-finder. A summary of Plaintiffs' chief allegations of breach, which present genuine disputes of fact, follow.

### 1. Delay In Closing Resulting In Reduction Of Purchase Price

Plaintiffs allege that SupplyOne unilaterally postponed the closing and did so with an improper motive, namely, with the intent to obtain a more favorable bargaining position such that SupplyOne could purchase TPI at a lower price. This particular theory of alleged breach is an attempt by Plaintiffs to hold SupplyOne to the original proposed purchase price of $3.5 million. Because detrimental reliance on the $3.5 million purchase price is the "meat and potatoes" of Plaintiffs' fraud in the inducement claim, this question is not addressed as a

contractual issue.[29]

## 2. Post-Closing Adjustments to Purchase Price Under Section 2.7

Under the APA, Wetmore was required: 1) to pay SupplyOne for any shortfall between the minimum asset value and the value of the assets actually delivered; and 2) to repurchase uncollected A/R and unsold (or obsolete) Inventory as of 180 days of the closing date. (APA, Sections 2.7(a) and (b)). Because SupplyOne was the drafter of the APA, and allegedly was not amenable to changes proposed by Plaintiffs, the terms of the APA must be construed strictly against SupplyOne. (2nd Wetmore Aff.) *See generally*, *Novacare Orthotics & Prosthetics East, Inc. v. Speelman*, 528 S.E.2d 918, 921 (N.C.App. 2000) ("[W]hen an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter – the party responsible for choosing the questionable language.") (internal citations omitted).

### a. Minimum Net Current Assets

Subsection 2.7(a) set out the net current assets adjustment. The "Minimum Net Current Asset Amount" was set at $727,000.00. (APA, Section 2.7(a)(i)). Pursuant to Section 2.7 of the APA:

> As soon as commercially reasonable, but in any event not later than 60 calendar days following the Closing Date, the Buyer[SupplyOne] *shall* prepare, in accordance with GAAP, and deliver to the Seller Parties[Plaintiffs] a balance sheet of the Companies reflecting the Net Current Assets as of the end of business on the Closing Date (the "Closing Date Balance Sheet"). If, as of such Closing Date, Net Current Assets are less than the Minimum Net Current Asset Amount, the Seller Parties [TPI, DBC, Wetmore] shall pay to the Buyer [SupplyOne] an amount sufficient to restore the aggregate Net Current Assets of [TPI and DBC] to the Minimum Net Current Asset Amount (the "Net Current Asset Deficiency").

---

[29] This factual allegation of breach would necessarily be based on Plaintiffs' claim of an implied contract resulting from the LOI, an alleged oral agreement, conduct by the parties, or some combination thereof.

(APA, Section 2.7(a)(i))(emphasis added).   Pursuant to Section 2.7, the Closing Date Balance Sheet triggers the process whereby the parties navigate any post-closing adjustment to purchase price for any Net Current Asset Deficiency.[30]   (APA, Section 2.7(a)(i) and (ii)).   Section 2.7(a)(ii) prescribes a "verification period" whereby the information contained within the Closing Date Balance Sheet could be vetted by the parties. (APA, Section 2.7(a)(ii)).   Any discrepancy the parties were unable to resolve after good faith attempts to do so was to be referred to a mutually agreeable accounting firm jointly retained by the parties. (APA, Section 2.7(a)(ii)).

Plaintiffs contend that SupplyOne, in failing to provide the "Closing Date Balance Sheet," deprived Plaintiffs of any reasonable opportunity to challenge the figures relied upon by SupplyOne and, therefore, that Plaintiffs are excused from any further contractual obligation. (Doc. 85 / Pls.' Mem. In Opp'n, at 3-6; 3rd Wetmore Aff., ¶ 6; Balke Aff. ¶ 11).   Plaintiffs argue that SupplyOne is prohibited from applying the Section 2.7 price adjustments in its favor.   In North Carolina, the doctrine of anticipatory breach may be summarized as follows:

> "[W]hen a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise perform under the contract because of the anticipatory breach of the first party."

*Southeast Brunswick Sanitary District v. City of Southport*, 708 S.E.2d 215, 2011 WL 340535, *9 (N.C.App. 2011) (quoting *Dixon v. Kinser*, 282 S.E.2d 529, 534 (1981)).

---

[30] Use of the word "shall" makes clear that SupplyOne's preparation of the Closing Date Balance Sheet was mandatory, as was Plaintiffs' Net Current Asset Deficiency payment.  (APA, Section 2.7(a)(i)).

SupplyOne does not appear to contest Plaintiffs' representation of fact – that the Closing Date Balance Sheet was not provided within the prescribed time period. SupplyOne claims instead that Plaintiffs cannot show any attendant prejudice because most of the balance sheet information was already in Plaintiffs' possession.[31] SupplyOne further claims that if this constitutes a breach, it was not material. Plaintiffs produce an email dated January 28, 2009, from Caruso forwarding a document titled, "beginning balance sheet.xls," to Morgan for her review. (Doc. 85 / Exh. 6). The same email states that Caruso will be in touch with Morgan to discuss "how we want this presented to Lou Wetmore." (Doc. 85 / Exh. 6). On Plaintiffs' behalf, Certified Public Accountant David Balke ("Balke"), TPI's Chief Financial Officer from January 2000 to March 2005, observes that "it is important to timely establish a balance sheet to evaluate financial information" in that delay makes it more difficult "to follow an audit trail of balance sheet line items." (Balke Aff., ¶ 11).

### b. "Best Efforts" Under Section 6.10 / Accounts Receivable & Inventory

Section 2.7(b) of the APA requires Plaintiffs to purchase uncollected Accounts Receivable and unsold Inventory deemed to be obsolete 180 days (or approximately 6 months) after closing. (APA, Section 2.7(b)). Pursuant to Subsection (b):

> On the Closing Date, the parties shall jointly determine the Inventory and Accounts Receivable to be included in the Purchased Assets, and shall assign a value to such Inventory and Accounts Receivable. ***To the extent that any Accounts Receivable remain uncollected, and / or any Inventory remains unsold and is classified as obsolete, as of the date that is 180 days after the Closing, the Buyer shall assign and deliver to the Seller Parties, at such Seller Parties' cost, the entire unsold Inventory and / or uncollected Accounts Receivable as promptly as possible***. The Buyer shall also provide to the Seller

---

[31] In its brief, SupplyOne refers to an "Opening Balance Sheet" as opposed to a "Closing Date Balance Sheet."

Parties a statement setting forth the value of such unsold Inventory and uncollected Accounts Receivable delivered or to be delivered to the Seller Parties, and the Seller Parties shall reimburse the Buyer for the entire value of such returned items within five business days after receiving the statement from the Buyer.

(APA, Sections 2.7(b)) (emphasis provided).[32] At closing, the parties were tasked with jointly determining starting values for both Accounts Receivable and Inventory included in the purchase. (APA, Sections 2.7(b)). Following the 180-day best efforts period, the onus shifted to SupplyOne to provide Plaintiffs with a statement setting forth the values of unsold Inventory and uncollected A/R. (APA, Sections 2.7(b)). Section 6.10 of the APA, entitled "Sale of Inventory; Collection of Accounts Receivable," reads:

"Subject to Section 2.7(b) above, the Buyer shall use its **best efforts** to sell the Inventory and collect all Accounts Receivable assumed as part of the Purchased Assets."

(APA, Section 6.10 at 36). The APA does not provide any definition or standard for measuring SupplyOne's "best efforts."

The "best efforts" evaluation will be for the jury. Plaintiffs contend that SupplyOne cannot enforce Section 2.7(b) against Wetmore given that SupplyOne failed to meet its own obligation under the APA to engage its "best efforts" to collect outstanding A/R and to sell the Inventory it purchased. Plaintiffs proffer the Affidavit of David Balke, C.P.A. ("Balke"), to explain TPI's practices regarding collecting on A/R and moving aging Inventory.[33] (Doc. 72 /

_____

[32] The APA does not explain how Inventory is characterized as "obsolete." The reference to Inventory that "remains unsold **and** is classified as obsolete," implies that the obsolete classification is *in addition to* not being sold during the first 180 days after closing. (APA, Sections 2.7(b)) (emphasis added). In fact, the parties have different views concerning the unsold Inventory.

[33] SupplyOne contends that Balke was not identified as a putative expert witness in a timely manner and is precluded from offering opinion testimony in the area of industry standards concerning

Pls.' Exh. 42).  The record tends to show that SupplyOne did not undertake its obligation with a firm footing, or with the necessary information (i.e., a jointly determined starting value).  In addition, despite the plan to merge SupplyOne's Rockwell with TPI's facility, a jury could reasonably find that Rockwell's Officers were ill-equipped to provide "best efforts."[34] Reportedly, Caruso planned to have Rockwell's  Accounting Manager / Controller Debbie Morgan ("Morgan"), participate in the financial due diligence.  (Doc. 72 / Exh. 10).   For whatever reason, Morgan did not participate in any of the financial due diligence or the closing. (Doc. 72 / Pls.' Exh. 9 / Morgan Dep., 136-141).  Consequently, Morgan's understanding of Rockwell's post-acquisition role concerning A/R and Inventory obtained from TPI  was limited. While not determinative, Morgan didn't have any written policies or procedures regarding the collection of A/R or what "best efforts" might require.  (Doc. 72 / Exh. 35 / Morgan Dep., 57). Similarly, Rockwell General Manager, Forrest Hammer, testified that he was not involved in evaluating TPI's accounting practices during due diligence either.  (Hammer Dep., 155-165).  In essence, Hammer agreed with the assertion that he "was handed all these accounting practices and books and records and told to do something with it."  (Hammer Dep., 155-165).  SupplyOne personnel understood that whatever did not get collected or sold would be bought back by Wetmore and credited to SupplyOne.

In June 2009, Caruso and Laughlin agreed that "the inventory is unauditable."  (Doc. 72 / Exh. 76).  The record does not make clear exactly how the Inventory became incapable of audit. Reportedly, on September 30, 2008, Wetmore invited SupplyOne to an on-site inventory count

---

A/R or Inventory.  (Doc. 87 / Def.'s Reply, at 9).

[34] Rockwell's Officers included: Forrest Hammer (General Manager), George Ruth (Operations Manger), and Debbi Morgan (Financial Manager).

for TPI and DBC/Merit but SupplyOne did not participate. (2nd Wetmore Aff., ¶ 13). In addition, after the physical transfer of assets occurred, and the pertinent records moved to a SupplyOne system, Wetmore's access to the relevant information concerning inventory was limited. (2nd Wetmore Aff., ¶ 18). Because the inventory was customer-specific, many customers had blanket purchasing orders or stocking agreements that fell within the parameters of a particular salesperson's duties. (Morgan Dep., 62-64). In this instance, the sales staff would utilize an inventory report to identify inventory being held for a given customer so that arrangements could be made with the customer to ship the product. (Morgan Dep., 61-64).

Plaintiffs' primary support for alleged breach of the "best efforts" requirement is correspondence from Rockwell's Hammer. (Hammer Dep. Exh. 18). In an email dated June 16, 2009, well beyond the 180-day period, Hammer identifies certain categories of inventory that SupplyOne may be in a position to waive Wetmore's repurchase obligation - in the event a purchase order or written stocking agreement exists or if there is inventory that a customer will take in the future. However, after explaining that in some instances it is beneficial for the customer to simply place a new order with SupplyOne for a lower price, Hammer's cooperation is qualified with the following statement:

> "I do not feel that it is our obligation to assist with any collections or payments for the sale of Triad receivables or inventories since this would clearly constitute a conflict of interest with a SupplyOne customer. You should discuss this with John[Caruso] since I was not party to any of the contracts between you and SupplyOne. It could be that we need to participate and Rockwell needs to understand this. Please let me know if you feel or know that I am incorrect with this so that we can provide the necessary help to meet our contractual obligation."

(Hammer Dep. Exh. 18). Wetmore implies that Rockwell *never* took any affirmative steps towards this end. Suggesting that "best efforts" would have proven successful, Wetmore testified that after SupplyOne identified certain A/R as uncollectible and Inventory as obsolete

for purposes of Section 2.7(b), Wetmore was able to ship all of the "obsolete" Inventory with the exception of one account (Welsh Packaging), and collect on all of the "uncollectible" A/R with the exception of three accounts (Tam San, Hickory Hill, and Belding Hausman).  (Wetmore Dep., 105-07).

The treatment of AP Exhaust Systems ("AP Exhaust"), TPI's former account, presents another dispute for trial.  Within Section 2.7 of the APA, entitled "Post-Closing Adjustment To Purchase Price," AP Exhaust is addressed as follows:

> (c) <u>Adjustment for AP Exhaust Matter</u>.  On the Closing Date, the parties shall jointly determine the value of any inventory and accounts receivable included in the Assets that is attributable to AP Exhaust System (the "<u>AP Exhaust Amount</u>").  Seller Parties shall exclude any such inventory and/or accounts receivable from the Purchased Assets, and Buyer shall deduct from the value of such AP Exhaust Amount from the Purchase Price payable to the Seller Parties at the Closing.

(APA, Section 2.7(c)).  With respect to A/R, the APA clarifies that any A/R relating to AP Exhaust  "are subject to litigation and will be excluded from representations and the transaction . . . ."  (APA, Section 4.13).   According to Plaintiffs, AP Exhaust was supposed to be included within the APA as an asset transferred to SupplyOne.  Plaintiffs contend that AP Exhaust and its outstanding A/R (along with inventory manufactured specifically for AP Exhaust) remained on the books of TPI contrary to the parties' agreement.  While the plain language of the APA states that the AP Exhaust System A/R was *not* purchased by SupplyOne, there is confusion surrounding SupplyOne's overall accounting of Plaintiffs' A/R.  (Doc. 72 / Pls.' Exh. 9; Doc. 41 / Pls.' Exhs. 33, 46).  Plaintiffs provide a "Funds Flow Memorandum" that was signed by the parties at closing and valued the AP Exhaust A/R at $142,432.31.  (Doc. 85 / Pls.' Mem. In Opp'n, at 6 / Exh. 4).  Plaintiffs contend that the original $727,000 minimum asset value should

have been adjusted to $584,567.69 to reflect the last-minute decision to exclude AP Exhaust A/R valued at $142,432.31. (Id.) SupplyOne contends that Plaintiffs' position is "inscrutable." (Doc. 87 / Def.'s Reply, 9). Nonetheless, Plaintiffs produce an email chain from Caruso to Laughlin on June 2, 2009 that reads in part: "I feel confident that when we lowered the purchase price, we lowered the thresholds, but I can find no record of how much." (Doc. 41 / Exh. 33). Laughlin further explains: "Our point of disagreement is him[Wetmore] taking credit for the AP Exhaust in the net asset calculation at the same time we excluded that asset from the purchase price." (Doc. 41 / Exh. 33).

In sum, the legal arguments advanced and the evidentiary record present classic jury questions. Because there are genuine factual disputes regarding the Closing Date Balance Sheet values, the starting point for the parties' post-closing adjustments to price is not ascertainable. Even if the starting values were settled, whether a material breach occurred in connection with one or more aspects of Section 2.7, Post-Closing Adjustment to Purchase Price, including whether SupplyOne utilized its "best efforts" for purposes of Section 6.10, are jury issues. SupplyOne's motion for summary judgment as to Plaintiffs' breach of contract claim will be denied.

SupplyOne's counterclaims alleging Plaintiffs' breach of warranty with respect to A/R and Inventory purchased are likewise for the jury. Under the APA, both the Buyer and Seller Parties made certain warranties with respect to the purchase of Plaintiffs' assets. SupplyOne contends that Wetmore breached the warranty that the A/R being transferred were "created in the ordinary course of business and are good and collectible," and that the Inventory being provided was "good, usable, and merchantable quality in all material respects and did not include

"obsolete or discontinued items." (APA, Sections 4.13, 4.14). Dispositive motions related to SupplyOne's counterclaims are <u>denied</u>.

### 3. Employment Contracts / Miscellaneous Post-Closing Access Claims

In addition to the APA, SupplyOne and Wetmore entered into an Employment Contract, which Wetmore also asserts has been breached in a multitude of ways. Wetmore was to be a sales representative for SupplyOne after the asset purchase. (Wetmore Dep., Exh. 5 / Morgan Dep., 187-88). Wetmore's compensation with SupplyOne was based, in part, upon a percentage of sales from the existing TPI and DBC customer base. (Morgan Dep., 206). Wetmore avers that he has no way to determine if he has been adequately compensated by SupplyOne because SupplyOne has not provided him post-closing access to information as prescribed by Section 6.11 of the APA regarding sales to the accounts that were purchased in connection with the acquisition.[35] (Wetmore Aff., ¶ 47). Other concerns related to compensation include SupplyOne's ability to track sales attributable to the former TPI sales staff and Wetmore, as well as SupplyOne's decisionmaking concerning sales opportunities accepted and passed upon.

Plaintiffs assert miscellaneous claims of breach having to do with Wetmore not having

---

[35] Section 6.11, "Post-Closing Access to Information," provides:

The Seller Parties and Buyer acknowledge that following the Closing, each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions contemplated herein, audits, tax returns, compliance with governmental requirements and regulations, and the prosecution or defense of third party claims. Accordingly, the Seller Parties and Buyer agree that for a period of three (3) years after Closing, each will make reasonably available to the other's agents, independent auditors, counsel, and / or governmental agencies, upon written request and at the expense of the requesting party, such documents and information as may be available for periods prior and subsequent to Closing to the extent necessary to facilitate concluding the transactions herein contemplated, audits, tax returns, compliance with governmental requirements and regulations, and the prosecution or defense of claims.

reasonable access to information under Section 6.11 of the APA. There is evidence tending to show that once the parties disagreed about the Post-Closing Adjustments to Price spelled out in Section 2.7, SupplyOne was generally less cooperative and less forthcoming. These issues will also be for jury determination.

### C. Plaintiff's Third Claim For Relief – Fraud

According to Plaintiffs, SupplyOne lured Wetmore to agree to an attractive deal SupplyOne had no intention of honoring. Plaintiffs' contentions of fraud all stem from the claims concerning different aspects of SupplyOne's failure to perform under the parties' agreement, such as imposing additional due diligence responsibilities on Wetmore, causing delay in the closing date, and seeking more favorable contract terms following the delay.

In order to demonstrate fraud in the inducement, Plaintiffs must proffer sufficient evidence from which the fact-finder could reasonably find: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Media Network, Inc. v. Long Haymes Carr,* Inc., 678 S.E.2d 671, 684 (N.C.App. 2009); *see also Breeden v. Richmond Community College*, 171 F.R.D. 189, 194 (M.D.N.C.1997) (citations omitted). "The mere failure to carry out a promise in a contract cannot support a fraud action." *TSC Research*, 552 F.Supp.2d at 543 (quoting *Strum v. Exxon Co., U.S.A.*, 15 F.3d 327, 331 (4th Cir.1994)) (a litigant's "attempt to turn a contract dispute into a tort action with an accompanying punitive dimension is inconsistent both with North Carolina law and sound commercial practice").

Viewing the facts in the light most favorable to Plaintiffs, the evidentiary record does not support Plaintiffs' claim for fraud. Plaintiffs' factual support for an alleged false representation

or concealment of material fact depends largely on SupplyOne's failure to immediately disclose its developing concerns with the acquisition during the summer of 2008. Aside from the July 31, 2008 closing date, there was no specific deadline for the completion of due diligence. The LOI stated that "SupplyOne will commence, promptly after the acceptance of this proposal, a due diligence review of the Companies' books, records, operations, technology, finances, prospects and other material aspects of the business and affairs of the Companies." (LOI, at 4). Caruso testified that due diligence normally only takes between four and six weeks total. (Caruso Dep., 230). Aside from arriving at some resolution regarding the TPI-Pinnacle Supply Agreement, there is little to explain the delays associated with due diligence. Plaintiffs' cooperation, including complete access, was expected and apparently given as SupplyOne has not made any claim that due diligence was hindered by Plaintiffs. (LOI, at 4). Even so, Wetmore agreed to postpone the closing via the June 24, 2008 letter. Assuming SupplyOne did not provide Wetmore with full disclosure as to its reasons, that does not amount to fraud.

Plaintiffs suggest SupplyOne operated in bad faith by extracting a lower purchase price from Wetmore at the conclusion of due diligence. The record reveals that SupplyOne, alert to the economic climate (including the loss of accounts by both TPI and DBC), prudently sought renegotiations at the close of due diligence. *Durham Coca-Cola Bottling Co.* is instructive regarding a party's exercise of discretion following due diligence. The Business Court described a party's exercise of discretion related to due diligence as "clearly standard practice for a business purchase transaction of this kind."[36] *Durham Coca-Cola Bottling Co.*, 2003 WL

---

[36] In dictum, the Business Court rejected the defense argument that the due diligence clause rendered the proposal incomplete and explained:

"Provisions such as this one, which condition a party's contractual obligations to

38

21017350, *10 n. 3.   More importantly, there is *no evidence* supporting Plaintiffs' allegation that the original $3.5 million deal struck in April 2008 was a ruse.

The rational for SupplyOne's decision to pursue a lower purchase price is disputed but not material for the reasons already explained.  SupplyOne contends that the reduction in  price was driven by the declining sales of TPI and DBC in the post-LOI due diligence period.[37] Wetmore argues that SupplyOne's primary reason for pursuing the deal was not related to sales but instead was due to the increased volume capacity, available equipment, and the ability of SupplyOne's Rockwell facility to easily absorb TPI's operations.  In the end, Wetmore agreed to a lower purchase price and indicated his mutual assent by executing the APA.

SupplyOne's motion for summary judgment on Plaintiffs' fraud claim is <u>granted</u>.

### D.  Fourth Claim For Relief  --  N.C. Gen. Stat. § 75-1.1

Under North Carolina's Unfair and Deceptive Trade Practices Act, a successful plaintiff must show: 1) defendant committed an unfair or deceptive act or practice; 2) in or affecting commerce; and 3) that plaintiff was injured thereby. *Gupton v. Son-Lan Development Co., Inc.*, 695 S.E.2d 763, 771 (N.C. App. 2010) (quoting *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 49

---

perform on an exercise of the party's discretion, are valid.  By law, a party must exercise its discretion under such a contractual provision both reasonably and in good faith."

*Id.,* 2003 WL 21017350, *10 n.3  (citing *Midulla v. Howard A. Cain Co., Inc.*, 515 S.E.2d 244, 246 (N.C.App. 1999)).  Thus, the parties are expected to conduct themselves reasonably and in good faith.

[37] SupplyOne's Caruso testified that "the main test" in due diligence  is cash realization or "[h]ow good are the sales."  (Caruso Dep., 231).  Caruso claims he never saw Laughlin's calculations concerning the initial purchase price offered to Wetmore. (Caruso Dep., 269-270). According to Caruso, "[p]urchase price is strictly earnings".  (Caruso Dep., 271).

(2009)).

"A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gupton*, 695 S.E.2d at 771 (quoting *Walker v. Branch Banking & Tr. Co.*, 515 S.E.2d 727, 729 (1999)). "Stated another way, a party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position." *Id.* (quoting *Carcano*, 684 S.E. 2d at 50.)) "A practice is deceptive if it has the capacity or tendency to deceive." *Id.* (quoting *Huff v. Autos Unlimited, Inc.*, 477 S.E.2d 86, 88 (N.C.Appp. 1996)).

As is often the case, a statutory claim for unfair and deceptive trade practice derives from another substantive cause of action. *See e.g., Durham Coca-Cola Bottling Co.*, 2003 WL 21017350,*18 (since § 75-1.1 claim rested on underlying claims of trade secret misappropriation, tortious interference with contracts, and civil conspiracy, all of which were properly dismissed at summary judgment, trial court properly dismissed claim alleging violation of § 75.1.1) (quoting *Combs & Assocs. Inc. v. Kennedy*, 555 S.E.2d 634, 641 (N.C.App.1998)). In this case, Wetmore testified that the claim for unfair and deceptive trade practices was premised upon *the same factual allegations* as the breach of contract claim. (Wetmore Dep., 39) (emphasis provided). The gist of Plaintiffs' unfair and deceptive trade practices claim is that SupplyOne intentionally breached the parties' *original* agreement. Plaintiffs' original agreement claim does not survive summary judgment. In any event, a garden variety breach of contract claim is not sufficient to establish a claim under § 75-1.1 for unfair or deceptive trade practices. *See Branch Banking and Trust Co. v. Thompson*, 418 S.E.2d 694, 700 (1992); *Strum v. Exxon Co.*, 15 F.3d 327, 333 (4th Cir.1994). Plaintiffs fail to proffer evidence of "substantial

aggravating circumstances attending the breach" because the record tends to show that SupplyOne simply changed its mind about the best approach upon acquisition, which was less attractive than originally thought. The overall economic climate in 2008 and 2009 cannot be attributed to either party. While SupplyOne was arguably in a better bargaining position than Plaintiffs during the relevant time period (which can be addressed within the context of the contract claims), the record does not support Plaintiffs' contention that SupplyOne set out to deceive or treat Plaintiffs unfairly.

SupplyOne's motion for summary judgment as to the unfair and deceptive trade practice claim is <u>granted</u>.

## V. Joint Motions of TRIAD PACKAGING, LOUIS WETMORE and DURHAM BOX COMPANY

For purposes of Plaintiffs' motions, the facts and inferences are viewed in the light most favorable to SupplyOne. *Rossignol,* 316 F.3d at 523.

Plaintiffs and Third-Party Defendant move for summary judgment on Defendants's counterclaims alleging breach of contract and breach of warranty. The essence of their motion is that Defendant SupplyOne breached the APA in material ways *prior* to the obligations Defendant claims constitute Plaintiffs' breach. Plaintiffs contend that SupplyOne failed to meet certain conditions precedent to Plaintiffs' performance, namely failure to satisfy Sections 2.7(a), 6.10, and 6.11 of the APA, which speak to the Net Asset Value, Accounts Receivable, and Inventory, respectively. However, for the reasons already discussed, genuine disputes of material fact exist and, therefore, preclude judgment as a matter of law in favor of either party as to these contractual issues. (*See, infra,* Section "IV, B").

## VI.  Order

For all of the reasons explained herein, it is, therefore, **ORDERED** that:

1)    SupplyOne's dispositive motions with respect to Plaintiffs' claims alleging unjustment enrichment / quasi-contract (First Claim), fraud (Third Claim) and unfair and deceptive trade practices (Fourth Claim) are **GRANTED** (Docs. 20, 26);

2)  SupplyOne's motions for summary judgment with respect to Plaintiffs' claim alleging breach of contract (Second Claim) as well as its motion for partial summary judgment as to its own counterclaim alleging breach of contract are both **DENIED** (Docs. 62, 63);

3)  Plaintiffs' motions for summary judgment are **DENIED** (Docs. 65, 70, 61);

4)  The parties' motions for hearing are **DENIED** (Docs. 53, 68);

5) Jury Selection will proceed in the Statesville Division **at 9:30 a.m. on Tuesday, May 7, 2013,** and the order of trial will be announced at that time;

6) The parties' Motion *in Limine* briefing is as follows:

> Motions *in Limine*, if any, are due **Monday, April  15, 2013**; and
> Responses are due **Monday, April 22, 2013.**

Signed: February 19, 2013

*Richard L. Voorhees*

Richard L. Voorhees
United States District Judge

42